# Dana *against* The Bank of the United States.

The board of directors of the Bank of the United States had power to assign its property and effects, in trust to pay certain preferred creditors, without the authority or consent of its stockholders.

Such power belongs to a corporation, like an individual, unless it be restrained by its charter or other legal provision.

The insolvency of the bank at the time of such assignment does not impair its powers to assign for the benefit of preferred creditors.

Schedules to an assignment not dated, referred to in the assignment as bearing even date with the assignment, will be taken to have been executed at the same time, and that might be shown by parol evidence if it were even necessary.

It is not usual nor necessary for a witness making probate of a deed to sign the probate; the certificate of the magistrate is sufficient.

A deed of assignment for the benefit of creditors is not rendered invalid by containing a reservation to the grantor of the surplus after paying the debts of the assignor provided for, such a reservation being implied by law, though not expressed.

Though such assignment be made by a failing bank and the surplus is alleged to exceed by 50 per cent. the debts preferred, yet if it is assigned as a pledge with right of redemption, the other creditors may redeem, and thus avoid its being locked up for a long time from such creditors.

A proviso in an assignment that the trust shall be closed within two years, and if not then closed, the assignees shall within six months sell remaining assets sufficient to pay the debts preferred, but stipulating also for payment and distribution among the preferred creditors from time to time, as often as there shall be moneys in hand, does not postpone the liability of the assignees to account, or protect them from being cited after a year, and is therefore no objection to the validity of the assignment.

[Dana v. The Bank of the United States.]

An assignment, good when made, cannot be affected by an Act of Assembly afterwards passed, on the ground that it was then known to the assignor that such Act was about being passed by the Legislature.

THIS case came before the court, on a motion by the plaintiff, Samuel Dana, to enter judgment against Mordecai Lewis and others, trustees in a certain deed of assignment executed by the defendants, the Bank of the United States, on the 1st of May 1841. The trustees had been made garnishees in a writ of attachment issued out of·this court, and their answers to certain interrogatories were filed. The only question involved was the validity of the assignment, which was as follows:

Assignment to secure the payment of sundry post-notes, held by certain banks of the city and county of Philadelphia. This indenture, made the 1st day of May 1841, by and between the President, Directors and Company of the Bank of the United States, of the one part, and James Dundas, Mordecai D. Lewis, Samuel W. Jones, Robert L. Pitfield and Robert Howell, of the other part. Whereas the said party of the first part are indebted to the following named banks in the city and county of Philadelphia, to wit, the President, Directors and Company of the Bank of Pennsylvania, the Philadelphia Bank, the Farmers' and Mechanics' Bank, the Commercial Bank of Pennsylvania, the Bank of North America, the Mechanics' Bank of the City and County of Philadelphia, the Manufacturers' and Mechanics' Bank of the Northern Liberties in the County of Philadelphia, the Kensington Bank ·in the County of Philadelphia, the Bank of the Northern Liberties, and the Bank of Penn Township in the county of Philadelphia, for sundry post-notes of the said party of the first part, amounting, in the whole, to $5,078,444.94; of which said post-notes a particular account is contained and set forth in a schedule hereto annexed, numbered 1, sealed with the seal of the said party of the first part, and bearing even date herewith. And whereas, the said party of the first part has resolved and agreed to provide an adequate security for the payment of the said notes, and of the interest to accrue upon them; Now this indenture witnesseth, That the said party of the first part, as well for the consideration aforesaid, as for and in consideration of the sum of one dollar to them in hand well and truly paid by the said party of the second part, at or before the sealing and delivery of these presents, the receipt whereof they do hereby acknowledge, have given, granted, bargained, sold, enfeoffed and delivered, assigned, transferred and set over, and by these presents do give,· grant, bargain, sell, enfeoff and deliver, assign, transfer and set over, to the said party of the second part, all and singular the lands, tenements and hereditaments, goods, chattels, moneys, rights, credits and effects of the said party of the first part, contained, described and set forth in a certain other schedule hereto annexed, numbered 2, sealed with the seal of the said party of the

first part, and bearing even date herewith : together with all deeds, papers and evidences belonging or relating thereto. To have and to hold all and singular the premises hereby given or granted, or intended so to be, to the said party of. the second part, and to the survivor of them, and the heirs, executors, administrators and assigns of the survivor ; to and for their and his own use and benefit for ever, as joint tenants, and not as tenants in common.

In trust, nevertheless, to and for the following uses, purposes and trusts, and to and for no other use or purpose whatever ; that is to say, in trust in the first place to enter upon the said real estate hereby granted, and to sell, dispose of, and convey the same in fee-simple, or for any less estate, by public or private sale, for the best price that can be had for the same, for cash or on credit, as may seem to them most expedient, and to give receipts for the purchase money, so that the purchaser or purchasers shall not be accountable for the application of the same; and in the mean time, and until a sale shall be made, to receive the rents, issues and income of the said real estate, and pay the charges thereon. And in the next place, in trust, to collect, receive and get in, all and singular the moneys due and owing to the said party of the first part, and hereby assigned, and the same as well as the proceeds of the real estate safely to keep to and for the uses and purposes hereinafter declared, that is to say : Firstly, to pay and discharge all reasonable and necessary expenses, costs and charges, attending the execution of this trust, in which, however, it is expressly understood and agreed, that no commission or other compensation whatever is to be charged by or allowed to the said trustees, or any or either of them, or to their or either of their successors or assigns. Secondly, from time to time, as often as they shall have moneys in hand of sufficient amount for a dividend, to divide and distribute the same rateably and equally in and towards the payment of the said post-notes, whether the same be then due or not due, and the interest accrued thereon, so that all and each may participate rateably and alike in every such dividend, until the same post-notes and interest shall be fully paid off and discharged. And in further trust, from and after the payment and discharge of the said post-notes and interest in full, to re-transfer, convey and pay over to the said party of the first part, their successors and assigns, whatever may remain of the premises hereby granted, and all moneys, credits and effects which may have been raised therefrom or any part thereof, and not applied to the purposes of the trusts herein and hereby created, without any deduction for commission or other compensation to the trustees, together with all deeds, papers, evidences and securities relating thereto. Provided always, and it is hereby expressly understood and agreed, that the trusts herein and hereby created shall, if practicable, be settled and closed within two years from the date of these presents ; and if it shall so happen that at the expiration of the said

v. — 29

period the same shall not be settled or closed, and any portion of the said post-notes shall remain unpaid, then the said party of the second part, or the survivor of them, or the heirs, executors or administrators of the survivor, shall, within six months, proceed to sell all the remaining estate, effects, rights and credits belonging to the trust, or so much thereof as may be necessary to complete the payment of the said post-notes, principal and interest, unless dispensed therefrom by the express authority in writing of the said party of the first part, their successors or assigns, and a majority in number of the banks hereinbefore mentioned. Provided also, and it is expressly understood and agreed, that if the said party of the first part, their successors or assigns, shall at any time pay off and discharge the said post-notes, or satisfy the holders of them, so that the said post-notes shall be surrendered or cancelled, then and from thenceforth the trusts herein and hereby created, or so much of them as shall then remain unexecuted, shall cease and be determined, and the whole of the trust property then remaining be conveyed, transferred and delivered to the said party of the first part, their successors or assigns. And it is hereby expressly agreed by and between the parties to these presents, as a condition and part thereof, that the said trustees, their successors or assigns, shall not be answerable for the acts, omissions or defaults of each other, but only each for his own acts, omissions or defaults, and that they shall not be answerable for the misconduct, omission or default of any agent or agents they may find it necessary to employ, being accountable only for the exercise of fair and reasonable skill and judgment, as well in the appointment of such agent or agents, as in the general management of the trust hereby created, if the same be conducted in good faith and intention. And the better to enable the said party of the second part, and the survivor of them, and the executors and administrators of the survivor of them, to execute the said trusts, the said party of the first part do hereby constitute, make and appoint them their attorneys, and an attorney irrevocable in the premises, for them and in their name, but to and for the uses and purposes of this trust, and at the cost of the same, to ask, demand, sue for, and recover and receive all and every sum or sums of money due or to become due by reason of any matter or *thing* herein granted and assigned, or intended so to be; to give receipts and acquittances for the same; and generally to act and do as fully and effectually in the premises, as they themselves might or could do, and substitute or substitutes one or more under them to nominate and appoint, and again at pleasure to revoke; hereby ratifying and confirming whatever they or their said substitute or substitutes may lawfully do in the premises.

It is understood that the foregoing indenture, or anything therein contained, is not in any manner to impair or affect the liability of the Bank of the United States, nor the rights of the other banks upon the said post-notes. In witness whereof, the said parties

have hereunto interchangeably set their hands and seals, the said The President, Directors and Company of the Bank of the United States, party of the first part, acting by their President, William Drayton, Esq., at Philadelphia, the day and year first above written.

The above was duly executed and proved.

*J. Randall*, for the plaintiff.

The question to be determined is the validity of the assignment executed by the defendants to James Dundas and others, dated the 1st of May, 1841.   The objections to this assignment are various, and may be subdivided under two heads.   1. Those objections which apply to the manner and form in which the assignment has been executed.   2. Those that affect more vitally its validity, as contrary to sound policy and law.

The first objection to the validity of this assignment is, that it refers to schedules Nos 1 and 2, as a part of it essentially necessary to its efficacy, and refers to them by their date as proof of their identity; and yet, upon examining the schedules attached to the assignment, they appear to have no date.   They can then only be identified by parol proof as part of the assignment.   In schedule 2, a large amount of real estate is included; and is it not a violation of the statute of frauds to attempt to convey this by parol? The deed refers to schedules, but from the want of dates they do not answer the designation, which is by date.   And hence parol testimony must be introduced.

The next objection is, that the witnesses to the probate signed before the mayor, do not sign the probate.   An almost universal practice on this subject has prevailed in this country for years. In case of an acknowledgment the officer only signs, but in case of a probate the witness also signs it.   This uniform practice is high evidence of the true construction of the law.   The reason assigned first is, that it gives greater security against frauds, and enables the party aggrieved, should the witness have sworn falsely, to prosecute him the more easily, and identify his deposition.   Our law has carried this species of evidence to an alarming extent. Deeds proved in an obscure magistrate's office in the remotest part of the State, may be admitted to despoil any man of his property.   Practice has introduced a useful caution or check, and it should not be disregarded.

The next objection is, that the board of directors had no authority to execute the assignment dated 1st May 1841.   This is a question of great gravity and importance, and is being agitated in every part of the country.   This question must, in the first instance, be discussed irrespective of the provisions of the Acts of Assembly, passed 4th and 5th May 1841.   These Acts, which were subsequently accepted by the stockholders as a part of their charter, fixed upon the board of directors various restrictions and

[Dana v. The Bank of the United States.]

limitations, which would be very material, if an assignment executed subsequently to these dates were now under consideration. These remarks are made to prevent any premature discussion or opinion on the validity of other instruments than the one in question.

The assignment is made by an insolvent institution, and it gives an unjust and unfair preference to one set of creditors, over other creditors equally meritorious. The proceedings of the general meeting of the stockholders, held on the 5th of April 1841, states the Bank to be in such a situation that it becomes necessary to determine what measures should be adopted, for the purpose of relieving the institution from its present embarrassment. The proceedings of the subsequent meeting, held on the 8th of April 1841, repeat and confirm the same statement. The case thus presented, is a banking institution, by its board of directors, assigning more than seven million of its assets to the local banks of Philadelphia, without any special authority from their *cestui que trusts* or constituents so to do. It is believed that the power conferred on the board of directors by the 2d section of the Act of Incorporation, does not authorize the transfer in question. The acts of corporations have at all times been received by courts with great caution and circumspection. The experience of every day confirms the wisdom of the early elements of law; and if, in any of the modern cases, the powers of directors have been by courts construed liberally, it has not promoted the benefit of those who are most interested. In *The People* v. *Utica Insurance Company*, (15 *Johns.* 383), C. J. Thompson says: " An incorporated company have no rights, except such as are specially granted, and those that are necessary to carry into effect the powers so granted; many powers and capacities are tacitly annexed to a corporation duly created, but they are such only as are necessary to the purposes for which it was established." The same doctrine is recognised by Judge Sutherland, in the case of *N. Y. Firemen Ins. Co.* v. *Ely*, (2 *Cow.* 698); by the Supreme Court of Connecticut in 5 *Conn. Rep.* 569; and by the Court of King's Bench in England, in the case of *Broughton* v. *The Manchester Water Works*, (3 *Barn. & Ald.* 12). The Supreme Court of the United States, in the case of *Beaty* v. *The Lessee of Knowler*, (4 *Peters* 152, 168), in the opinion delivered by Judge M'Lean, says: " That a corporation is strictly limited to the exercise of those powers which are specifically conferred on it, will not be denied. The exercise of the corporate franchise being restrictive of individual rights, cannot be extended beyond the letter and spirit of the act of incorporation." In the case of *Slee* v. *Bloom*, (19 *Johns.* 475), C. J. Spencer, speaking of the acts of corporations, says: " Suffering an act to be done which destroys the end and object for which the corporation was instituted, must be regarded as equivalent to the doing an act which produces the very same consequences."

It must be evident that this assignment did not, nor is it calculated to sustain the object of the incorporation; on the contrary, that it tended to destroy and annihilate its existence; the intention was to sustain the institutions *for* whose benefit the conveyance was executed, and not the institution *by* whose directors it was executed. In the case of *The State of Maryland* v. *The Bank of Maryland*, (6 *Gill and Johns.* 216, 217), C. J. BUCHANAN relies much on the fact, that the assignment was general, and for the benefit of all the creditors of the bank. " Equality (says he) is equity, and when a debtor makes a transfer of his property, for the purpose of equal distribution among his creditors, he does an honest act and discharges a moral duty, which none can reasonably complain of." In the case of *Pope* v. *Brandon*, (2 *Stewart's Alabama Rep.* 404, 405), Mr Justice COLLIER also relies on the fact that the assignment is a conveyance of the property of the bank without preference or priority to its creditors. The rights of an individual in Pennsylvania to give one creditor a preference over another, cannot now be doubted, however much the original decision may be regretted. It ought, however, not to be extended. There is a manifold distinction in the exercise of this power, between a corporation and an individual. The individual acts for himself, the board of corporators acts for others; when an individual has given to one class of creditors all his property, his personal liability remains; when a corporation parts with all its property, it becomes extinct, and all future hope of recovery is annihilated.

The assignment in question is liable to objection on another ground. It was executed not only without consulting the stockholders, but in direct violation of the wishes and instructions of the stockholders. At the regular adjourned annual meeting of the stockholders, held on the 8th of April 1841, the following resolution was passed:—" *Resolved*, That a part of the assets of the bank be placed in the hands of trustees, as a pledge for the purpose of securing the ultimate payment of its post-notes, circulation, and deposits, in the event of an arrangement being made with the other city and county banks to receive its notes in payment and on deposit; and in case such arrangements should fail to be made, then in trust for the security of the present circulation and deposits." The assignment of the 1st of May 1841, was in direct contravention of the plain and obvious meaning of this resolution. The fourth fundamental article of the charter of the bank recognises this meeting as one at which " the directors shall lay before them (the stockholders) a general and particular statement of the affairs of the company," clearly implying that the directors shall be governed by the opinions and instructions delivered by the stockholders at such meetings. This view is more potential, when it is considered that the fifth resolution, above quoted, has never been rescinded nor modified, remaining in full force at the time

the assignment of the 1st of May 1841 was executed, and that the assignment itself has never been ratified or confirmed by a meeting of the stockholders.

The next objection is the reservation of a surplus to the grantors, with the power of redemption. It is conceded, that these features in an assignment by an individual would not be fatal; but it is thought that the rule is different in the case of a corporation. Here, on the face of the transfer, the sum of $7,772,250.33 is locked up to pay $5,078,444.94, the surplus vested in assignees entirely exempted from process until the latter sum shall be fully paid and satisfied, and the grantors having the power of redemption at any time they may think proper.

Another objection to the validity of the assignment on which the plaintiff principally relies, and which he believes to be fatal, is the extension of time given to the trustees to execute the trust. The assignment gives *two years* to settle and close the trust; *six months* longer to sell the remaining property, unless expressly dispensed with in writing by the grantors, when, from the terms of the deed, any indefinite time may be allowed to complete the execution of the trust. It is difficult to distinguish this case from the case of *Sheerer* v. *Lautzerheizer*, (6 *Watts* 543); every exceptionable feature in the decided case exists in the present case with accumulated strength. In the prior case, the excess of time was nineteen days; here it is one year in the first instance, six months afterwards, and then, by the mutual agreement of the parties, the most latitudinarian extension of time. The court are familiar with the case in 6 *Watts*, and it is unnecessary to dwell upon it; it is believed that the salutary rule there laid down by Judges HUSTON and KENNEDY includes the present assignment. The Supreme Court, in the case of *Whallon* v. *Scott*, (10 *Watts* 239), recognises the former decisions, and decided that " a voluntary assignment is bad when it conveys only the possession of the effects assigned and not the property for 25 days and upwards, that if within that time the assignor shall satisfy certain creditors named, then the effects were to be returned to the assignor; if not, then they were to be sold for the use of the creditors." They also decided, that " the assignment is void if it empowers the assignor to retain the goods during that time, without making any appropriation of the proceeds." The concise and logical argument of the learned Judge who delivered the opinion of the court, can receive no additional force from any illustration counsel may make in the present case.

Another objection to the assignment is, that it was executed to evade the provisions of the Acts of 4th and 5th May 1841. When it was executed, the first of these Acts had actually passed both houses of the Legislature, and was before the governor for his approval. The assignment was made on the 1st of May 1841, and the Act of the 4th of May had passed both houses of the

[Dana v. The Bank of the United States.]

Legislature on the 30th of April preceding. This Act compels all assignees of the Bank of the United States to accept her notes in payment of debts assigned; but the assignees under this assignment seek to avoid this clause by showing that this assignment was of a previous date. It is manifest that this assignment was precipitated to avoid that clause of the Act. It is submitted that it is in this respect analogous to an assignment to evade or defeat an execution, and that under the circumstances of the case this assignment is rendered null and void.

*F. W. Hubbell*, and *J. Sergeant*, for the defendants.

1. Of the power of the corporation to make this conveyance; and 2. whether this power, if possessed by the corporation, has been exercised by its proper organs.

Had the corporation, entitled The President, Directors and Company of the Bank of the United States, power to make the assignment in question? This inquiry must be pursued under two views. 1. Simply and absolutely. 2. Under the modification produced by the supposed insolvency of the bank.

1. Of the general and unqualified question of the power of this corporation to convey its property for the purpose of paying debts. This has never been questioned; and is a power expressly bestowed by the charter, in these words: "Sect. 1. Shall be capable to have, purchase and receive, possess, enjoy and retain to them and their successors, lands, rents, tenements and hereditaments, goods, chattels and effects, of whatsoever kind, nature, or quality, and the same to sell, grant, demise, alien or dispose of, to sue and be sued," &c.; and that it may assign its property for the benefit of creditors, has been directly decided in the case of *Pope* v. *Brandon*, (2 *Stewart* 401). See also, Judge KENNEDY's opinion, *Commonwealth* v. *Bank of Pennsylvania*, (3 *Watts & Serg.* 205), and the cases cited by him. Also, *State of Maryland* v. *Bank of Maryland*, (6 *Gill & Johns.* 220).

2. Is this power restrained by the insolvency of the institution? In what the notion originated that a bank thus situated, becomes unable to part with its property for the benefit of its creditors, I know not. The current of authority sets entirely the other way. *Haxtun* v. *Bishop*, (3 *Wend.* 13); *Catlin* v. *The Eagle Bank*, (6 *Conn. Rep.* 231). In this case, the notion that a bank upon its insolvency, becomes a trustee for its creditors, is repudiated, and an assignment for the benefit of a particular creditor, or creditors, is upheld. Nor is there anything established by the case of *Commonwealth* v. *Bank of Pennsylvania* which at all conflicts with the doctrine of *Catlin* v. *The Eagle Bank*. That decision restraining the Pennsylvania Bank from assigning her funds, turned entirely upon an Act of Assembly which made the bank a trustee for the Commonwealth; and gave the Commonwealth a preference. Judge SERGEANT in delivering the opinion

of the court, declares: That had the application to dissolve the injunction been made before the passage of that Act, the injunction would have been dissolved. "Had this objection been taken by the defendants at the time of making this answer, and had a motion to dissolve the injunction then been made, the case would have come before us free from some of the circumstances that now attend it, &c. In the mean time, &c. on the 29th March 1842, the Legislature passed an Act of Assembly, &c. By the 9th section of that Act a preference is expressly given to the Commonwealth." We have before us the inedited opinion of a majority of the Supreme Court of Alabama, in the case of *Conway et al., Assignees of the Real Estate Bank, ex parte;* wherein almost all the questions raised in the present case are discussed with great learning, and decided in favour of the assignees. Of the particular power of the corporation to make an assignment, they use this remarkable language: "To question the power of an individual debtor or banking corporation in failing circumstances to make an honest assignment of all their property to pay their debts, would be to assail one of the principal safeguards of public liberty, by fettering the free enjoyment of private property."

There being nothing, therefore, to prevent the bank from making an assignment, the next question is, has this power been exercised by the proper organs of the bank? The assignment was made by authority of the board of directors alone. Had the board of directors power to direct and authorize such an act? The 3d section of the charter of the bank provides "for the *management of the affairs* of the said corporation, there shall be annually elected twenty directors." A broader commission could scarcely be devised; the meetings of stockholders have scarcely more extensive powers: "A general meeting of stockholders for purposes relative to the institution, may at any time be called," &c. This distinction has been pointed out and attempted to be sustained. The *management of the affairs of said corporation,* seems, it is said, to contemplate the continued existence of the corporation; whereas *purposes relative to the institution* may be applied without violation of the ordinary meaning of the words to the very act of closing up, discontinuing or annulling the corporation.

From this, if just, it would result, that a *general assignment,* which operates a dissolution of the corporation and the surrender or forfeiture of its charter, *The People* v. *Hudson Bank,* (6 *Cow.* 217), is beyond the powers of the board of directors. This is, however, not an undisputed consequence of a *general* assignment; for in the case of *State* v. *Bank of Maryland,* (6 *Gill & Johns.* 205), it is decided, that although such general assignment renders the corporation unable to discharge the ordinary purposes of its institution, yet it does not, in consequence thereof, cease to be an existing corporation. So in the case of *Revere* v. *The Boston Copper Company,* (15 *Pick.* 351), a general assignment to trustees and

[Dana v. The Bank of the United States.]

vote of a majority of its members to dissolve it, was held not to operate its dissolution. Nor are we at all willing to acquiesce in this limitation of the powers of the board of directors.

In the charter will be found two classes of provisions, intended, of course, to be harmonious, and, therefore, requiring the charter to be so construed as to keep them in harmony. They exist in all charters, without exception, and, on that account, the question is of great general importance, deserving careful consideration, and careful decision too. There is the more necessity for this, as some confusion has existed not only in the common mind, but in the professional mind also, for want of accurate investigation. The confusion referred to, is owing to a vague notion that there are some acts within the power of the corporation which require the concurrence of the stockholders and the board of directors, and that such concurrence will give them validity, though they would otherwise be invalid. Probably (though it is not necessary to consider the matter very closely) some may consider it not exactly as a concurrence, but rather in the nature of a delegation of authority by the stockholders to the directors. A moment's attention to the arrangement of the charter, in reference to the two classes of provisions before mentioned, will show that the notion just mentioned, taken in either way, is erroneous.

1. The first class of provisions confer, define, and limit the powers and capacity of the corporation. 2. The other declares how, and by what instrumentality, these powers and capacities may be exerted. The plan, it will be perceived, is not to make a distribution of powers and capacities, but to enable the corporation to appoint a body, chosen by themselves according to the charter, to exercise those powers and capacities. Such an arrangement is not a matter of choice, but of absolute necessity, for it would be impossible for the corporation, in its aggregate, to execute these powers, being too large a body, and subject to continual changes. It would be equally difficult to conceive how it is possible that the aggregate body should have a restraining or enlarging power. The same objections, and even greater, exist against this qualified interference, than against the exercise of the whole power. In general, then, the whole power of the corporation is entrusted to the representative body, with such exceptions and limitations as are expressed in the law, or are necessarily to be implied from what it contains. From this view it follows, that the aggregate body, as such, can claim no right but such as is expressly given, or expressly reserved by the charter, the necessary implication being against them. In the construction thus established, it will be remembered, every stockholder has an interest and right; so have the public, and so has every person who deals with the corporation: and, moreover, each and all of them have given their assent to it, if it be the true one.

v. — 30                    u *

The charter now in question will, as to the present question, be found to be quite clear.

1. The general powers and capacities of the corporation are given by the second section of the Act. Specifications of them, restrictions upon them, and possibly some particular enlargements, occur in other parts of the Act. The mass of them is to be collected from the whole of the Act, comparing the different parts of it.

2. In section 3, provision is made for the election of directors, and a scale of voting established. In the same section, the powers of the board of directors are conferred. They are in general terms, and as comprehensive as the whole scope of the operations of the bank. The entire "management" is devolved upon them. There is no exception. The entire responsibility for the "management" rests with them. There is not a word in the Act which gives to the stockholders the power of increasing or diminishing their accountability. The single right of the stockholders is to elect them at stated periods, which, according to our views of government, is an adequate security. The directors are accountable, also, for every breach of their trust, not by reason of any express provision of the charter, but according to the law of the land, as other persons are; and this general law makes them answerable to the whole extent of the trust for the application of their own discretion, and not the discretion of the stockholders.

If this be admitted (as it must be,) as to any portion of the corporate powers, *e. g.* the contracting of debts, those who make the admission, must show where the line is drawn. There is no such thing in the Act. But it would be a very singular discrimination indeed, to so draw the line, that the power of contracting debts should be plenary, and the power of paying or providing for them, be withheld or crippled. Certainly, it is not to be presumed, being contrary to the plain duties of justice and morality. The presumption would be the other way; that is, in favour of every power an individual has to provide for the payment of his debts, fully, if he can—as far as his property will go, if he cannot pay in full. Sufficient, it is hoped, has been said upon this point, to satisfy the court, and we have dwelt upon it more at length than we should have done, if it had not been a question of general importance, which the court are now called upon for the first time to decide.

But be this as it may, let it be supposed, for the sake of argument, that a general assignment is such an entire suspension of the corporate purposes or affairs, as to be beyond the power of agents who are authorized to *manage* the *affairs* of a corporation. The assignment in question is, but of a portion of the effects of this corporation: an assignment to secure and pay a meritorious class of creditors; to apply a portion of the assets of the bank for this purpose, in such way as to insure their being administered in the most advantageous way for the benefit of the bank. Every rea-

[Dana v. The Bank of the United States.]

son, economical, equitable and prudential, commanded it. It did not operate disadvantageously to the other creditors; for it gave these particular creditors no more than their just proportion of the assets; and the bank, by excluding the beneficiaries of the assignment in question, from all benefit under the subsequent assignments, has prevented the appropriation of this property from operating as a preference. The board of directors had the right, (it will not be disputed), to mortgage or pledge any particular piece of property to any particular creditor, for the payment of his debt, and to interpose trustees both for the security of the bank and the creditor; and to give him the power of sale. If they have this power as to an individual item of property, and a particular creditor, they must have the same power as to many items of property and many creditors; for it is but the repetition and grouping of particulars and individuals; and the exercise of this license or authority can only become vicious according to the conceded data upon which we are now arguing, by its being so far extended as to disorganize the institution which they are delegated to manage but not to destroy. *Northampton Bank* v. *Pepoon*, (11 *Mass.* 288). " The directors have power to control all the property of the bank."

But, even if this assignment were originally invalid by reason of the want of authority in the board of directors, it has been confirmed, by repeated meetings of the stockholders. Since the execution of the assignment, it has been brought distinctly before three general meetings of the stockholders and has been passed by those meetings without censure; nay, the subsequent assignments, which distinctly recognise the assignment in question, have received direct votes of approbation. The first meeting of stockholders after the assignment, was held May 4, 1841. At that meeting, this assignment was reported to the meeting and the following resolution was moved: " Resolved, That in the opinion of the stockholders of said bank, such assignment is in derogation of the authority of the stockholders and therefore not approved by them." This resolution was fully discussed, and then put to vote and lost. This was more than indirectly an approval of the assignment. At a meeting of stockholders held on the 8th of April, 1841, a resolution had passed to make this assignment, upon condition that the other banks would agree to receive the notes of the United States Bank in payment and on deposit. The other banks resolutely refused to accede to this condition, and then this assignment was made without this condition. The rejection of the resolution of censure at the meeting of the 4th of May, was a confirmation of the whole. A further meeting of the stockholders was held on the 18th of May 1841, at which a resolution was passed touching a further assignment. On the 3d day of January, 1842, the stated annual meeting of stockholders was held, and a formal written report of the assignment in question, and two subsequent ones, 7th

[Dana v. The Bank of the United States.]

June and 4th September, were made. A resolution of censure, upon the two last assignments, was brought in, and postponed to an adjourned meeting; but the assignment in question was not molested. At the meeting of stockholders, held February 21st 1842, the resolution condemning the assignments of the 7th of June and 4th September, adjourned from the meeting of January 3d, was rejected, and a resolution was passed commending them. The assignment of the 1st of May, although fully before the meeting, passed this meeting as it had the previous ones, without censure. Since then, there have been two meetings of stockholders, which, with full knowledge of this assignment, have in no wise disapproved of it.

In regard to this kind of ratification, see *Gordon* v. *Preston*, (1 *Watts* 386), GIBSON, C. J. "The maxim which makes ratification equivalent to a precedent authority, is as much predicable of ratification by a corporation, as it is of ratification by any other principal, and it is equally to be presumed from the absence of dissent. Now the validity of the mortgage is unquestioned by the corporation even at this day, though its existence has all along been known to the corporate officers, whose duty it was to disavow it, had there been an intent to contest it." In that case, an acquiescence for eight months was deemed a sufficient ratification. See likewise, *Proprietors of the Canal Bridge* v. *Gordon*, (1 *Pick.* 297); *Bank of the United States* v. *Dandridge*, (12 *Wheat.* 72, 74); *Dunn* v. *St. Andrew's Church*, (14 *Johns.* 118); *Abbot* v. *Hermon*, (7 *Greenl.* 118).

Having established the authority under which the deed was executed, let us consider whether there be anything in the provisions of the deed itself which avoid it. Many objections of this kind have been made.

1. The deed contains a resulting trust, in favour of assignees. Is this vicious? We find the answer in *Livingston* v. *Bell*, (3 *Watts* 198). In that case, there was such a resulting trust, and the court, upon solemn argument, pronounced the assignment valid. See also *Angel on Assignments* 128, and the cases cited.

2. The deed contains a clause, by which the assignors are entitled to redeem, upon paying the debts for whose protection the assignment is made, before a sale actually takes place. Does this vitiate the assignment? On the contrary, it validates and confirms it. It makes it of the nature of a mortgage; and no man ever heard that a mortgage might not be given in payment of a just debt. The clause of redemption leaves an equity in the mortgagor, which may be levied on and sold by the creditors. We do not find any authority on this point; but neither do we find any principle against it. This clause of redemption requires no delay. The property remaining at the close of the redemption is all that it operates upon. This is nothing but what the law implies.

3. The deed contains a clause in these words:— "Provided always, and it is hereby expressly understood and agreed, that the

trusts herein and hereby created, shall, if practicable, be settled and closed within two years from the date of these presents: and if it shall so happen, that at the expiration of the said period, the same shall not be settled or closed, and any portion of the said post-notes shall remain unpaid, then the said party of the second part, or the survivor of them, or the heirs, executors or administrators of the survivors shall, within six months, proceed to sell all the remaining estate, effects, rights and credits belonging to the trust, or so much thereof, as may be necessary to complete the payment of the said post-notes, principal and interest, unless dispensed therefrom by the express authority in writing of the said party of the first part, their successors or assigns, and a majority in number of the banks hereinbefore mentioned." This clause has been argued to be obnoxious to the same condemnation as was the assignment in the case of *Sheerer* v. *Lautzerheizer*, (6 *Watts* 543). This renders a careful examination of that case necessary. The assignment, in that case, was dated the 11th day of December 1832; and it provided, that the assignee should pay the debts of the assignor on the 1st day of January 1834, and thus gave him nineteen days beyond a year for the performance of his trust. On this provision of the assignment, Judge HUSTON, in delivering the opinion of the court, commented as follows : " The Legislature have, by various Acts, recognised such assignments, and prescribed modes of compelling the settlement of accounts of assignees and trustees, who, by the Act of 1818, might be cited to settle, if they omitted to do so for two years; and by the Act of 1828, they may be called to a settlement at the end of one year." The court below had decided, that the assignment was invalid, because it directed the assignees to pay over in a period longer than a year from the date of the assignment. " If," says Judge HUSTON, " the debtor can give time beyond the law, how far can he go ? If nineteen days in this case, it may be so many weeks in the next case, and as many months in a succeeding case. We are of opinion, that there was no error in the charge of the court :"—and Judge KENNEDY declared, " It is obvious, that if debtors are permitted to appoint any time they please for the settlement and distribution of the estate assigned, the Acts of Assembly, which authorize the courts to compel it to be done at any time after one year, will be defeated." And again : " Further time (than one year) may, no doubt, in many cases, be requisite for making a final settlement and distribution of estates assigned for paying the debts owing by the owners thereof: but then this, where the creditors are not willing to grant it, can only be obtained, upon application to the proper court and sufficient cause shown."

If the Judge means by this last sentence, that a direct application to the proper court must be made for an extension of time, I will observe, that such an application is unknown in practice. If, however, he means, as I presume he does, that, to qualify this, in

[Dana v. The Bank of the United States.]

answer to a creditor's citation, the impossibility of closing the trust may be urged as an excuse for presenting a partial, *i. e.* not final account — then he speaks of what is familiar to the whole profession. We may venture to affirm, in regard to the city of Philadelphia, that the accounts of not one trust in five hundred, are closed within one year from the date of its creation. Most commonly, they are pending for years; and it seems to have been the intention of these assignors (Bank of U. S.) to place a limit on this indulgence. They have, therefore, inserted this arbitrary clause of compulsion. The very best excuse or reason shall not justify the assignees in delaying the final closing of their accounts beyond two years and six months. But in the mean time, there is no suspension of duty on the part of the assignees, nor of power on the part of the creditors, to compel them to settle the accounts of their trust, and to make distribution. The clause in question is undoubtedly one of compulsion, and not of license. The Act of Assembly of 1828, referred to in the opinion of Judge KENNEDY, and the existing substitute for it, viz. the Act of the 14th of June 1836, merely allow a citation for the purpose of compelling the assignee to exhibit his accounts. Sect. 7, Act of 14th June 1836: "It shall be lawful for the Court of Common Pleas of the proper county, on the application of any person interested, &c. to issue a citation to any assignee or trustee for the benefit of creditors, whether appointed by any voluntary assignment, or in pursuance of the laws relating to insolvent debtors, &c., requiring such assignee to appear and exhibit under oath or affirmation, the account of the trust in said court," &c. And the 8th section provides: "No such citation shall be issued, until after the expiration of one year from the date of the assignment to or appointment of such assignees or trustees." No power is given *to compel* them to dispose of the property assigned; it is confined to compelling them to exhibit an account.

The compulsory power, in regard to the performance of the trust is contained in sections 11 and 12 of the same Act; which empowers the court, when the assignee is "wasting, neglecting, or mismanaging the trust estate," to dismiss such assignee from the trust. Then this power of dismissal, and the power perhaps, in extreme cases, of charging the assignee in account with the value of the property which he has neglected to sell, are the only methods known to our law, of forcing the assignee to perform his duty. The clause in the assignment in question has done no more than to furnish conclusive evidence that the assignees are *neglecting* their trust, if they do not wind it up at the end of two years and six months. In the mean time, it is their duty to wind it up, settle and close it, *if practicable.* They are enjoined "to enter upon the real estate, &c., and to sell, dispose of and convey the same in fee-simple, &c.; *and from time to time, as often as they shall have moneys in hand of sufficient amount for a dividend, to*

*divide and distribute the same rateably and equally, &c.*; and from and after the payment of said post-notes in full, to retransfer, &c.; here then is a duty presented without indulgence. The power to cite at the end of the year is not interfered with. The duty to exhibit an account at the end of the year, as far as the assignee shall have proceeded in his trust, is not interfered with. The duty to sell and collect without delay, and the duty to distribute as fast as received, are all expressly enjoined. By the general law, the assignee is entitled to excuse the performance of all these duties, by showing inability or inexpediency to sell, dispose of, or collect. The assignment in question, at the end of two years and six months, puts a peremptory bar to these excuses, however good they might otherwise be deemed. It is true, power is given to the assignors and *cestui que trusts* to remit this injunction, but this clause of remission is strictly confined to that office; it does not *enable*, legalize or sanction delay. The word used, is *exempt*, a term admirably adapted to the mere office of remission; when so remitted, the assignment remains precisely as though the clause had never been inserted. Let us compare this assignment with that in *Sheerer* v. *Lautzerheizer*, which furnishes the rule of condemnation. The very trust and duty bestowed or imposed upon the assignee, was to pay over his collections to the *cestui que trusts* on the 1st of January 1834. He was under no duty; and it is doubtful whether he had even the power to do it before. Had he been cited at the end of the year to settle his accounts, or to be dismissed for negligence, he could have appealed to the assignment as an answer to such citation. There is, therefore, no likeness in the cases. The strongest argument, it seems to me, that can be urged against this clause in the assignment in question, is, that it may lead to the destruction of the property by precipitating the sales. This argument is not, however, one which creditors can take under the statute of Elizabeth: it has no tendency to hinder or delay, and smacks not at all of fraud.

As this deed was originally drafted, the assignees were prohibited from selling under one year, but this clause was stricken out; had it remained, it would have demonstrated too plainly to be questioned, that the two years' clause was not meant for delay, as the delay expressly required was limited to one year. Even this limit of delay was, however, thought to jeopard the validity of the assignment. The result of this striking out has been what is commonly the fate of alterations in instruments; the harmony of the whole is injured.

These provisions are in no respect different from the law respecting the settlement of the accounts of the estates of decedents. They are identically the same, and must have the same meaning. An executor or administrator may be cited, at the end of a year, to settle his accounts. But no one ever understood that he was bound then to close the estate and make a final settlement.

[Dana v. The Bank of the United States.]

On the contrary, repeated accounts are of every day's experience, without limit as to number or time. Each settlement is of what has been done up to its date, and no more. So, with respect to assignees, they may be cited at the end of a year to settle their accounts up to that time. In the present assignment, there is nothing to exempt the assignees from liability to citation, nor to prevent the court from compelling them to divide what they may then have on hand. All this is left to the law. The clause in question relates to a different thing, namely, when they shall be compellable to sell, at whatever sacrifice, the remaining assets of every sort, if the debts intended to be secured by the assignment are still unpaid. The objection in *Sheerer* v. *Lautzerheizer*, (6 *Watts* 543), was to an entirely different provision, namely, that whatever money might come into the hands of the assignees, they were to hold, without dividing or accounting, till the end of one year and nineteen days; a clause which the court condemned upon very clear grounds. Such a clause, indeed, could not be founded upon any good motive, and was evidence, *per se*, of *actual* fraudulent intent, as well as inconsistent with the terms of the Act of Assembly, and, being so, nineteen days were as inadmissible as nineteen months or years. But in the present assignment the motive was just, and there is nothing incompatible with the full exercise of the powers of the court. Not an hour is allowed to the assignees. The distinction is clear. So much for those provisions in the deed which have been said to invalidate it. Next, as to the external causes of avoidance which have been urged against this assignment.

1. It has been said that it was executed in fraud of the Act of the 4th of May 1841. That is, there is a proviso in that Act compelling the assignees of the Bank of the United States to accept the notes of that bank in payment of all debts assigned to them; and it is said that that assignment bears internal evidence that the parties to it knew that the Act in question was on the eve of becoming a law, and that the execution of the assignment was hurried, in order to avoid its being subject to the terms of that proviso in the law. Suppose that we should concede those facts for the sake of the argument. Our adversary would persuade us that coming legislation casts its shadows before it; and that he who would govern his conduct by the law, must not only know what the law is, but what it is likely to be. A thing is lawful until it is prohibited by law. Legislation is peremptory, inflexible, and unconditional. It exacts obedience, and claims no aid from the governed. It is sufficient to itself, and enforces its sanctions by its own penalties; yet the position we are combating regards it as a court of law regards a feeble compact between parties requiring the kindliest guardianship. There can be no fraud until there is some duty; and no duty existed until the law was passed. That is lawful which accords with the law. Up to the very moment

[Dana v. The Bank of the United States.]

that the Act in question was actually passed, another law prevailed, which must measure this transaction. The position we are combating is a mistaken view of the nature of legislation. This is the most favourable view of the transaction for our adversary. It will be seen that this assignment was the performance of solemn pledges, on assurances made months before its date, and long before the Act in question was thought of. It also appears that the whole terms of the assignment are adjusted and agreed on many days before it was actually executed. The argument, therefore, drawn from the imminency of the Act of Assembly in question at the date of the assignment, falls to the ground.

2. It is said that the schedule No. 2, attached to the assignment, is without date. That schedule is referred to in the assignment, thus: " All and singular the lands, tenements and hereditaments, goods, chattels, moneys, rights, credits and effects of the said party of the first part, contained, described and set forth in a certain other schedule hereto annexed, numbered 2, sealed with the seal of the said party of the first part, and bearing even date herewith." This schedule was actually attached to the deed at the time of its delivery, by sealing-wax and tape. It was numbered as stated in the deed, and the seal of the bank was impressed upon it, and it was subscribed by the president and cashier. But it was without date. If " bearing even date herewith" means that a date was intended to be inscribed upon it, and not merely that the date of the body of the deed extends to it, then the omission was a mere inadvertence. Its entire immateriality is rendered apparent, when we consider that the only purpose of the date was the identification of the schedule, and that purpose is completely subserved by its physical attachment to the deed at the time of its execution and delivery, by the number, and also by the impression of the seal. The date would have been required for no other purpose. A mere schedule of property has nothing in its structure requiring a date. If a date were inscribed, it would have been a mere awkward and unmeaning superfluity. The following authorities are conclusive on this point: " Where an assignment described property in so vague a manner that it was impossible to say whether it was comprehended in the assignment or not, held that a notice, before the interest of any third person had attached, to the person in whose hands the property was, given by one of the assignees, that the property had been assigned to them by deed of a certain date, and requesting him to consider it for their use and subject to their order, to which was attached a writing signed by the assignor, 'I confirm the above,' though not an original appropriation, amounts to a declaration identifying the property intended to pass by the deed; and, therefore, it was error to instruct the jury that such a paper was no more than a construction by the parties of the original assignment, and of no more weight than that of any other person." *Passmore* v. *Eldridge*, (12 *Serg. & Rawle* 198).

[Dana v. The Bank of the United States.]

In 4 *Mason* 206, the assignment contained a provision, " and it is further agreed, that such alterations and additions may be made in and to the said schedules by the mutual consent of one of the parties to each part of these presents, as shall be necessary for a more perfect and correct statement of the matters and things therein contained." Per STORY, " My judgment is, that this clause does not vacate the assignment." The assignment in that case conveyed all the property in warehouse No. — Washington street; and it was held that that blank might be filled up from other sources. 8 *Pick.* 63; 2 *Paige* 311. Even if this schedule was inoperative as a deed, it would be a good equitable designation of the property; and the assignor would hold it in trust for the assignees, and could be compelled to make a more perfect conveyance. *Drakely* v. *Deforest*, (3 *Connect.* 272).

3. Another exception taken is, that the deed is proved by witnesses in order to admit it to record, and that the witnesses have not signed their deposition; but the officer has merely certified to their having appeared and made oath. The simple and conclusive answer to this exception is, that the Act of Assembly requires nothing more than the certificate of the magistrate. Act of the 28th of May 1715, § 2, " Whereupon the same justice shall under his hand and seal certify such acknowledgment or *proof* upon the back of the deed, and the day and year when the same was made, and by whom." *Stroud's Purd.* 273. The witness shall be examined on oath or affirmation to prove the execution of the deed, and the magistrate is to certify that such proof was made. Both an acknowledgment and proof are to be certified in the same way, and it was never objected that the party acknowledging must sign the acknowledgment. Even where a witness is examined under a commission, he need not subscribe his deposition. *Moulson* v. *Hargrave*, (1 *Serg. & Rawle* 201); *Ketland* v. *Bisset*, (1 *Wash. C. C. R.* 144).

The opinion of the Court was delivered by

KENNEDY, J.—The Bank of the United States having become largely indebted, even beyond its means of making payment, as is believed, to the holders of its notes and others upon engagements of a different nature, among whom were the other banks of the city and county of Philadelphia, in the aggregate sum of $5,078, 444.94, being the amount of sundry post-notes held by the latter against the former, the President, Directors and Company of the Bank of the United States, for the purpose of securing the payment thereof, with the interest due and to become due thereon, to said banks respectively, on the 1st day of May 1841 executed a deed, conveying to James Dundas, Mordecai D. Lewis, Samuel W. Jones, Robert L. Pitfield and Robert Howell, certain lands, tenements and hereditaments, goods, chattels, moneys, rights, cre-

[Dana v. The Bank of the United States.]

dits, effects, belonging to the Bank of the United States, in trust, to sell, dispose of and convey the same, and to apply the same or the proceeds thereof towards the payment of the said post-notes, as directed by the deed, which is set out in the statement of the case, to which I refer. The great, and indeed the only matters in contest between the parties, are the validity and effect of this deed. The objections to it present two principal questions: 1. Had the board of directors sufficient power and capacity to execute it? And, 2. Has it been executed and authenticated in such manner and form as to render it operative and effectual, and, at the same time, to entitle it to be received in evidence?

In regard to the first question it may be observed, that, according to the principles of the common law, every corporation has, by being duly created, tacitly annexed to it, without any express provision, the same power and capacity of suing and being sued, impleading and being impleaded, granting and receiving by its corporate name, and of doing all other acts, that a natural person has. And this power or capacity has been said to be necessarily and inseparably annexed to it. 1 *Kyd on Corp.* 69. But that it has, at least, every capacity that is necessary to carry into effect the purposes for which it was established, cannot well be questioned. It is also capable, by the general rule of the common law, of taking any grant of property, privileges and franchises, in the same manner as a private person. 1 *Kyd on Cor.* 74; *Lit. Rep.* 49, 112, 114. And this capacity extends alike to real and personal property. 1 *Kyd on Cor.* 76. In regard, however, to real estate, restraints are frequently imposed by statute, though not often as to personal. *Id.* 78. So corporations, unless expressly restrained by the Act which establishes them, or some other Act, have and always have had an unlimited power over their respective properties, and may alienate and dispose of the same as fully as any individual may do in respect to his own property. 1 *Id.* 108; 1 *Sid.* 162. That the President, Directors and Company of the Bank of the United States were capable of acquiring and holding the property described in and intended to be assigned by the deed and the schedules thereto annexed, is not denied; nor can it be, for, independent of the rule of the common law on the subject, they are, by the second section of the Act creating them, a corporation not only " made capable in law to have, purchase and recover, possess, enjoy and retain to them and their successors, lands, rents, tenements, hereditaments, goods, chattels and effects, of whatsoever kind, nature and quality, but likewise to sell, grant, demise, alien or dispose of the same, to sue and be sued, to use a common seal, and the same to alter and renew, and to make such by-laws and ordinances as they shall deem necessary, not being contrary to that Act, the constitution of the United States, or to the constitution and laws of this Commonwealth; and also to prescribe rules for the transfer of the stock of the said corporation, and generally to do all the acts

[Dana v. The Bank of the United States.]

which to them it shall or may appertain to do, and to enjoy the same privileges and authority given by law to any bank within this Commonwealth, subject to the rules and restrictions thereinafter prescribed." And by the third section of the Act it is further enacted, that " for the management of the affairs of the said corporation, there shall be annually elected, at the banking-house in the city of Philadelphia, on the first Monday in January in each year, by a plurality of votes, which shall be given by the qualified stockholders of the said bank, in person or by proxy, .twenty directors, who shall be capable of serving for one year, and who shall, at the first meeting after their election, in each year, proceed to elect one of their directors to be president of the corporation, who shall hold the said office during the same period for which the electors are elected." But the bank being insolvent at the time, it is alleged, it is therefore argued that it could not assign its property, or any part thereof, so as to give a preference to a portion of its creditors in receiving payment of their claims against it; or at least, if it could, it was not competent for the president and directors of the bank to do it, without the previous consent and authority of the stockholders. The ground of this position is, that the assignment in this case is unjust, because it gives a preference to one set of creditors over another equally meritorious; and, consequently, as no power to execute a deed, bestowing such a preference, is given, either expressly or by necessary implication, to the board of directors, by the Act establishing the bank, it is not competent for them to exercise it.

Although it may be true generally, in the abstract, that the creditors of a person or corporation are equally meritorious, yet, owing to the peculiar circumstances under which debts may be occasionally created, such a predicate cannot be considered altogether correct; and the debtor may not only be under a moral, but a legal obligation, if unable to meet the payment of all his debts, to give a preference. For instance, one debt may arise from the creditor's having supplied the debtor with necessaries for himself and his family, at a time when, from adversity and misfortunes, he was deprived of the means of procuring them, and found himself even without credit adequate to the end, excepting with the individual who supplied him, upon his express engagement to pay the debt so created before all others which he owed at the time, and created while he was in affluent circumstances, by his becoming surety for some of his friends, who were also at the time in good circumstances, from which he derived no benefit whatever. Now it cannot be questioned that his sense of gratitude in such case, as well as a sense of justice, would lead him to pay the first-mentioned debt in preference to the second, if unable to pay all. Indeed, it is impossible to believe that the universal sense of mankind would not unite in declaring that. a preference, in such case, would be perfectly just and right, without any promise having been made to give a pre-

ference. So, if a debtor, at the time of creating a debt, agrees to give subsequently, in case he fails to pay it on a particular day fixed for that purpose, a lien on, or to-make an assignment of either a part or the whole of his property, it cannot be doubted that he is both morally and legally bound to do so if he fails to make payment agreeably to his promise, notwithstanding it may have the effect of enabling the creditor, in such case, to obtain payment of the whole of his claim, when, by reason thereof, the other creditors of the debtor are excluded from receiving any or the greater part of their claims. Although a bank cannot readily become a debtor as in the first case suggested, yet it may become such in the second as readily as an individual; and in many others that might be mentioned, where the reason for giving a preference would be equally strong. In the second case, it is very apparent that a bank or a corporation would be as clearly and as strongly bound to give the preference, by executing the assignment in fulfilment of its previous promise, as an individual would be, unless it could be shown that it was restrained from doing so by the Act creating it. But in this case, although there are some restrictions placed on the bank by the Act establishing it, yet it cannot be pretended, or at most cannot be shown, that the bank, or its president and directors, are either expressly or impliedly restrained from giving, directly or indirectly, preferences to some of its creditors over others. And, not being restrained in this respect by this or any other Act, it must be deemed to have the same power to make a distinction between its creditors, and to give preferences to some of them over others, that any natural person has. That the latter has such power is not denied, but admitted, by the counsel for the plaintiff.

But, supposing the bank to have such power, it seems to be objected, that it cannot be exercised by the board of directors without their having some direction or advice from the stockholders, showing at least that they are willing it should be exerted. This, however, does not appear to be necessary from the tenor, or any particular provision contained in the Act establishing the bank. It is true that general meetings of the stockholders, for purposes relative to the bank, are contemplated and provided for by the fourth article of the charter, without, however, giving to them, at such meetings, any specific power or control to be exercised over the affairs of the bank. And in the same article it is directed that there shall be a general meeting of the stockholders on the first Monday of January every year, at which time the directors are required to lay before such meeting a general and particular statement of the affairs of the bank.

Notwithstanding, however, such general meetings are to be held " for purposes relative to the institution," without specifying these purposes, yet it does not necessarily follow, that the stockholders, at such meetings, may exercise any immediate and direct control or authority over the affairs of the bank, or over the board of

v. — v *

[Dana v. The Bank of the United States.]

directors in the management of the same.   It may frequently be
very desirable to the directors, and indeed conducive to the ad-
vancement of the interest and prosperity of the institution, that
they should have an opportunity afforded of consulting with and
receiving from the stockholders their opinion and advice in rela-
tion to the affairs of the bank, and as to what ought to be done
under existing circumstances, in respect to the management
thereof; or it may happen that the stockholders or some portion
of them may be desirous, from many and various causes, to have
a general meeting, in order to inquire and consult with each other,
in regard to the affairs of the bank, and the management of the
same by the directors, so that if they, or at least a majority of
them, should come to the conclusion that the state and condition
of the bank may be improved by any change in the management
of its affairs, then they may advise the directors thereof, who,
if they approve of the change suggested, may conduct themselves
accordingly.   This I take to be the utmost that the stockholders
can do, according to the tenor and design of the Act, under which
they must all act, until an election of the directors shall come
around, when the former, if dissatisfied with the conduct of the
latter in managing the affairs of the bank, may turn any one or
more or the whole of them out of the direction, and place it in
other hands, which they may think will be more likely to conform
to their wishes in conducting and carrying on the business of the
institution.   This seems not only to be sufficient to satisfy all that
was intended by the Act, in providing for general meetings of the
stockholders to be held, but likewise quite as much as can be use-
ful, or in any way rendered practicable.   Indeed it would be
utterly impossible for the stockholders, personally, to carry on and
conduct the business of such an institution, which requires daily
attention and action; and hence, of necessity, it must be committed
to the discretion and management of agents, appointed generally
by the stockholders, which seems to be the most that they can do,
towards influencing or directing the management of its concerns.
To extend the power or authority of the stockholders beyond this,
would also be incompatible with the third section of the Act of
their incorporation, which expressly directs that a board of direc-
tors shall be elected and organized "*for the management of the
affairs of the said corporation.*"   And the president and directors,
though elected by the stockholders, are constituted the agents of
the corporation, not of the stockholders, and derive all their autho-
rity from the Act or charter.   *Per* MARSHALL, C. J., in *The Bank
of the United States* v. *Dandridge*, (12 *Wheat.* 113).   The manage-
ment and direction of the affairs of the institution are committed
to them by the express terms of the Act of incorporation.   They
are thereby made the representatives of it, and they alone have
the power to manage its concerns, and are left, without control,
to exercise their own best discretion in doing so.   The stockhold-

ers, therefore, have no absolute right to interfere directly with, and to exercise any immediate control over the directors in the management of its affairs. See *Commonwealth* v. *The Trustees of St. Mary's Church*, (6 *Serg. & Rawle* 508). But still, it must be understood, that being but agents, at most, of the corporation, the directors cannot exceed the authority granted to them by the Act of incorporation, or if they do, their principal will not be bound thereby. *Salem Bank* v. *Gloster Bank*, (17 *Mass.* 29, 30); *Lincoln and Kennebec Bridge* v. *Richardson*, (1 *Greenleaf* 81). Here, however, no excess of authority appears in anything that has been done, unless it be that the insolvency of the bank, the instant that it took place, converted all the property and effects belonging to it into a trust fund, for the use and benefit of its creditors generally, and thus devested the board of directors of the power of giving preferences by assigning the same, or any portion thereof, to a part of their creditors, for the purpose of securing to them the payment of their claims.

This doctrine, however, was repudiated by the Court of Errors in the State of Connecticut, in the case of *Catlin* v. *The Eagle Bank*, (6 *Conn.* 233). There it was held by the court, that the board of directors of the Eagle Bank, though the bank was insolvent at the time, had full power, not only to assign the property of the bank in order to secure the payment of its debts generally, but to give a preference by mortgaging the real estate of the bank, and assigning sundry promissory notes of the same, to the Savings Bank, as security for the payment of a debt owing by the former to the latter. Chief Justice Hosmer, in delivering the opinion of the court, says : " It is difficult for me to conceive, where no restraint is interposed in a charter of incorporation, on what ground the general authority delegated can be subjected to exceptions, or fettered by restrictions, from which an individual and a mercantile company are free," page 142. In accordance with the same principle, the Court of Appeals of the State of Maryland decided, in *The Union Bank of Tennessee* v. *Ellicott*, (6 *Gill & Johns.* 363), that the president and directors of the Bank of Maryland had full power to provide for the payment of the debts of the institution, by executing a deed conveying all the property of the bank in trust for that purpose. And in the *State of Maryland* v. *The President and Directors of the Bank of Maryland, and Ellicott and others*, (*Ibid* 206), the same court held the opinion, that an individual debtor, in failing circumstances, might prefer one creditor to another by a transfer of his property made in *good faith;* and that a corporation or bank might do the same. Chief Justice Buchanan, in delivering the opinion of the court, observes : " No satisfactory reason has been advanced, and none is perceived why a corporation, in failing circumstances, unless restrained by some express provision in the charter of incorporation, which is not the case here, may not assign its property to trustees, for the benefit of either *preferred* creditors, or all its

creditors equally, as well as an individual in insolvent circumstances. The same relation of debtor and creditor subsists in the one case as in the other." All that is said here, in respect to what a corporation may do, is peculiarly applicable to a corporation created for the purposes of trading and banking, where the business consists chiefly of buying and selling bills of exchange, and drafts or checks, and in discounting bills and notes, by means whereof it either becomes a creditor or debtor, which makes it necessary for it to attend to the payment and receipt of all debts created, in the course of such dealing, as they shall fall due. It is easy to perceive that the success of its business must depend entirely upon the punctuality and promptitude with which it meets all its engagements. Hence the very object and design for which such a corporation is established, renders it indispensably necessary that it should have as complete and absolute a right, at all times, to dispose of and transfer its property and effects for the purpose of paying or securing the payment of its debts, or of giving, as has been done in this instance, a part of its property and effects to secure the payment of certain debts only as any individual or mercantile company has or have. Hence also the Bank of the United States in this case, if it had not had any express power granted to it, by the Act of its incorporation, to dispose of and assign its property for the purpose of securing and making payment of its debts, either in part or in whole, as the occasion might seem to require in the judgment of the board of directors, would have had such power by necessary implication, from the very nature of its business, unless it were expressly restrained by its Act of incorporation, which is not alleged or even pretended. Seeing then that the Bank of the United States was invested with full power to do all that was done, or intended to be done, in this case, and that it necessarily appertained to the management of the affairs of the bank, it follows as an inevitable consequence, as has been clearly shown above, that it belonged to the president and directors and to them alone to do it, as also to determine on the propriety of its being done.

Having shown that the board of directors had capacity and full power to execute the deed in question, it remains to notice some objections of a minor character, which have been taken and are involved in the second question mentioned in the outset. The first is, that the deed contains a reference to two schedules, making them constituent parts thereof, as *bearing even date* with the deed, whereas the schedules annexed to the deed are without date. It is therefore objected that they cannot be the same referred to in the deed; and without the proper schedules the deed is imperfect and can be of no avail. And even if in point of fact the schedules be the same that were intended to be referred to in the deed for the purpose of making them parts thereof, no evidence exists to establish the fact, except that of parol, which cannot be received, as is alleged, without

[Dana v. The Bank of the United States.]

entrenching upon the statute against frauds. We do not concur in the view taken, nor yet in the inference drawn by the learned counsel for the plaintiff, of and from the circumstance of there being no date actually written on each or either of the schedules, that they are therefore necessarily to be taken as different from the schedules intended to be annexed to the deed or parts of it. It is certainly wholly unnecessary that any date should be written on a schedule in such case; and without its being done, it will be taken to be of the same date with the deed to which it is annexed, so far as the date may be of any importance. And where the schedule, in every other respect, appears to meet the requisition and description contained of it in the deed, and to have been annexed to the deed at the time of its execution, it would not, perhaps, be straining the matter too far to say that the words "bearing even date herewith," were inserted for the purpose of making it known that the schedule was made of the same date with the deed. But as it is not usual to place a date upon a schedule, in such case, and in no case requisite, the most natural conjecture would seem to be, that, though called for by the deed, it was omitted from inadvertance merely, unless something more were shown tending to raise a contrary conclusion. Besides, if it were necessary to show by evidence *aliunde,* that the schedules, in this case, were the same that were intended to be attached to the deed at the time of its execution, so as to become parts of it, parol evidence, it is conceived, would be admissible for such purpose. To receive it would not militate against the statute of frauds; because it would not add to, alter, or diminish, in the slightest degree, anything that had been written, or be supplying anything that ought to have been reduced to writing between the parties, in order to give efficacy and effect to their intention and design.

The second objection is against the probate of the deed, because not signed by the subscribing witness to the deed, who appeared before the mayor of the city of Philadelphia, and upon his oath made proof of the execution of it, without subscribing his name to the probate so made, which is certified by the mayor under his hand and the seal of his office, to have been made by the trustees. A signing by the witness is not required by the Acts of Assembly authorizing the probate of the execution of such deeds to be made before certain officers; neither is it the universal practice so to do. And where the execution of deeds, instead of being proved, is acknowledged by the grantors before a proper officer, the acknowledgment is never signed by such grantors. A certificate of its having been done, from the officer under his hand and the seal of his office, if he has one, is, and always has been deemed sufficient. Indeed, I am not aware that a certificate of the acknowledgment of a deed ever was excepted to, because not signed by the party who made the deed and the acknowledgment of its execution. We are of opinion the objection is not, and cannot be sustained.

[Dana v. The Bank of the United States.]

A third objection is, that the deed contains an express reservation of the surplus to the bank, which may remain after paying the debts, for the payment of which the assignment was made. If no provision of the kind had been inserted in the deed, the law, by its operation, would have given and secured to the bank any such surplus. It would therefore be singularly strange, that an express provision, in exact accordance with what the law would have done without it, should be made a fatal objection to the validity of the deed. It is admitted by the counsel for the plaintiff, that this objection would be unavailing against the deed of assignment executed for a like purpose by an individual. But it is contended, that in the case of a banking corporation, in failing circumstances, as here, where the property assigned appears, according to the estimate made of it by the corporation itself, to exceed the amount of the debts to be paid by means of it fifty *per cent.*, and upwards, it would, in effect, as is alleged, if such an assignment were permitted to avail, be locking up upwards of two and a half millions of property belonging to the bank in the hands of the trustees, named in the deed, from the other creditors of the bank, instead of permitting the other creditors to come on it in the hands of the trustees without delay. But, according to the terms of the deed of assignment, the property passed thereby must be considered as pledged merely for the payment of the debts, or post-notes, mentioned in the deed, accompanied with a power to the trustees to convert it as soon as practicable into money, and therewith pay the holders of said notes, unless the assignors shall redeem it before this can be done, by paying the notes for which it was pledged. The property assigned appearing thus to be a pledge, connected with a power given to the trustees to sell it, if not redeemed, was placed, at all times, within the reach of the other creditors, who could, if they had thought there was anything to be made out of it, towards paying their debts, have redeemed it, by paying the debts for which it was pledged, and have had it taken in execution and sold, and after reimbursing themselves the money paid for its redemption, out of that arising from the sale, have applied the surplus to the payment of their own debts. 1 *Bro. Abr.*, tit. Pledges, *pl.* 24. But admitting, as it has been, that a similar deed, executed for the like purpose by an individual, would be valid, seems to be giving up the objection; for no satisfactory reason has been, and, as it appears to me, none can be advanced for making a distinction between the two cases.

A fourth objection made to the validity of the deed is, that it contains a proviso " that the trusts therein and thereby created shall, if practicable, be settled and closed within two years from its date ; and if it shall so happen that at the expiration of the said period the same shall not be settled and closed, and any portion of the said post-notes shall remain unpaid, then the said party of the second part (the trustees) or the survivors of them, or the

heirs, executors or administrators of the survivor shall, within six months, proceed to sell all the remaining estate, effects, rights and credits belonging to the trust, or so much thereof as may be necessary to complete the payment of the said post-notes, principal and interest, unless dispensed therefrom by the express authority in writing of the said party of the first part, their successors or assigns, and a majority, in number, of the banks thereinbefore mentioned;" and that this provision is repugnant to the Acts of Assembly made in this behalf, and to the decision of this court, made in the case of *Sheerer* v. *Lautzerheizer*, (6 *Watts* 543).  In that case the deed of trust was made on the 11th of December 1832, and the trustee, by its terms, was not required or directed to pay anything out of the trust fund towards discharging the debts until the 1st day of January 1834; so that, by the terms of the deed, he was not liable to be called on to pay over, or to distribute any moneys that might be in his hands, arising from a sale made of the trust property, for more than a year after the date or execution of the deed.  This was considered contrary to the Acts of Assembly on the subject, which authorize the courts, at any time after a year from the date of the assignment, upon the application of any one interested, to cite the trustee to settle and close his trust account, if he has not done so, or otherwise show good cause why it cannot be done.  But, in the case before us, it is manifest that the two years, or two years and six months, were not introduced for the purpose of favouring the trustees, or putting off their liability to account and pay over moneys received by them from the trust property, to the holders of the post-notes, for any length of time after a sufficient sum shall have been received by them, to make a dividend of it among those entitled to receive it.  This is demonstrated by another clause in the deed, which expressly requires the trustees, " from time to time, as often as they shall have moneys in hand of sufficient amount for a dividend, to divide and distribute the same rateably and equally in and towards the payment of the said post-notes, whether the same be due or not due, and the interest accrued thereon, so that all and each may participate rateably and alike in every such dividend, until the same post-notes and interest shall be fully paid off and discharged."  It is clear, therefore, from the whole of the deed taken together, that it is the duty of the trustees to convert the trust property into money, or at least so much of it as may be necessary to take up the post-notes as soon as practicable, and from time to time, as they shall receive money for that purpose, to pay it over without delay; so that there is nothing in the deed to protect them from being cited, at any time after the lapse of a year from the date of it, to appear before the proper court to settle their trust account.  The fourth objection, therefore, is not sustained.

A fifth objection, which is the last that remains to be noticed,

[Dana v. The Bank of the United States.]

is, that the deed was executed on the 1st of May 1841, in order to evade the provisions of two Acts of Assembly, which were then about being passed, and were actually passed afterwards on the 4th and 5th days of the same month. It certainly cannot be pretended that an Act of the Legislature is to be regarded as a rule by which men or corporations shall be bound or governed in their intercourse and transactions with one another, before it has come into existence. It would be most singularly strange, as also unjust, if it did, unless men were to be gifted with the faculty of diving into futurity, and thus made acquainted with what is to come, as well as that which has past. Otherwise they would be liable to be punished for transgressing laws of which it was absolutely impossible that they could have any knowledge, as they were not in being. A man may have reason to believe that a certain law will be enacted by the Legislature, but until it has passed through and received the approbation and sanction of its several branches, he, or any other person, is not bound to regard it as a law or rule by which he is obliged to govern himself; nor is he bound to forbear or abstain from doing that which it is lawful for him to do as the law then is, merely because he has reason to believe that the Legislature are about to enact a law that will make it unlawful for him to do it or the like thing after the enactment has taken place. It is impossible, in the nature of things, that an act can be pronounced unlawful, and therefore void, if not done in violation of any law in force at the time. This objection is, therefore, without even the shadow of a foundation to support it.

Motion for judgment against the garnishees denied.