[No. 3707. Decided July 12, 1901.]

GALUSHA PARSONS *et al., Appellants,* v. TACOMA SMELTING AND REFINING COMPANY *et al., Respondents.*

CORPORATIONS — ACTS OF TRUSTEES — WHEN VOIDABLE AT SUIT OF STOCKHOLDER.

The action of a majority of a board of trustees is voidable upon the complaint of a stockholder, where the vote of a trustee interested adversely to the corporation was necessary to effect such action; and Bal. Code, § 4257, which provides that "a majority of the whole number of trustees shall form a board for the transaction of business and every decision of a majority of the persons duly assembled as a board shall be valid as a corporate act," is inapplicable in such cases, since the policy of the law forbids a trustee to assume a double function where there are adverse interests to be considered.

SAME — ACTS IN EXCESS OF CORPORATE POWERS — VOIDABLE, ALTHOUGH AUTHORIZED BY MAJORITY OF STOCKHOLDERS.

The articles of incorporation of a corporation constitute a contract entered into by all the stockholders, whose terms cannot be abrogated without the consent of all; hence a lease of the corporate property authorized by a majority vote of the stockholders is voidable at the suit of a non-consenting stockholder, where the articles of incorporation contain no express power to make such lease.

SAME—CAPITAL STOCK—OWNERSHIP BY ANOTHER CORPORATION.

One corporation cannot acquire the right to purchase and hold stock in another corporation merely by expressing such power in its articles of incorporation, where such ownership of other corporate stock is not expressly authorized by statute.

Appeal from Superior Court, Pierce County.—Hon. THOMAS CARROLL, Judge. Reversed.

*Parsons, Parsons & Parsons,* for appellants.

*J. M. Ashton, W. O. Chapman* and *W. L. Sachse,* for respondents.

The opinion of the court was delivered by

REAVIS, C. J.—Appellant Parsons, original plaintiff, brings suit as a stockholder of the Tacoma Smelting & Refining Company against the corporation and the trustees thereof and the Tacoma Smelting Company, a corporation. The other appellants intervened, likewise as stockholders, and united with the plaintiff. Appellants, as minority stockholders of the Tacoma Smelting & Refining Company, pray the cancellation of a lease executed by the Tacoma Smelting & Refining Company to the Tacoma Smelting Company. Their complaints allege substantially that the meeting of trustees who resolved upon the execution of the lease did not have a legal quorum of the board present to adopt the resolution; that a majority of the stock of the Tacoma Smelting & Refining Company had, in fact, been transferred to the Tacoma Smelting Company, and was controlled in the interest of the latter company; that at the stockholders' meeting where the trustees were authorized to execute the lease the majority of the stock was controlled by the Tacoma Smelting Company, and voted by a trustee of that company, who was also trustee of the Tacoma Smelting Company; that by the execution of the lease the Tacoma Smelting & Refining Company ceased to perform the functions for which it was organized. After issue joined by the respondents, a trial was had, and a decree followed, dismissing the action. No special findings of fact were made by the superior court. Upon an examination of the facts admitted in the pleadings and shown by the testimony at the trial, so far as deemed material to state, it appears that the Tacoma Milling & Smelting Company was organized under the laws of this state in Pierce county, in 1887, with a nominal capital of $1,000,000. Before commencing business, however, in March, 1890, it amended its articles of

incorporation, and changed its name to the Tacoma Smelting & Refining Company, and made a board of seven trustees.   Under the latter name it opened stock subscription books, and the whole amount of the capital stock, $1,000,-000, was subscribed.   There was, however, an agreement made among the subscribers that the stock should be paid for at 50 per cent. of its par value.    Theretofore a smelting plant had been erected about seven miles from the city of Tacoma by other parties, and the plant was sold to the corporation for the sum of $375,000, and paid for in capital stock at 50 per cent. of its par value.   Respondents Browne and Oakes were respectively elected trustees and president and vice president, and Rust was employed as manager at a salary of $8,000 per year.   He was also secretary and a trustee during all the times mentioned thereafter.   A Mr. Clark was assistant at a salary of $3,600 per annum, and Mr. Daly at a salary of $2,400.   In December, 1898, four of the trustees of the Tacoma Smelting & Refining Company—Browne, Oakes, Rust, and Anderson—met, and resolved that it was for the best interests of the corporation to lease all its plant and properties for the period of ten years for the annual rental of $5,000, and the payment of taxes, and advancing funds to take up the indebtedness of the company, which was about $50,000.   The proposal to make a lease had come through Mr. Rust from a Mr. Perkins, of San Francisco, and, in substance, it was that Mr. Perkins would form an incorporation which should lease all the property of the Tacoma Smelting & Refining Company, and pay the rental as mentioned, if he (Perkins) or the new company could have an option for 18 months to purchase three-fourths of the capital stock of the Tacoma Smelting & Refining Company at $25 per share.   This proposition was submitted by the board of trustees to the stockholders

of the corporation at a meeting called in December, 1898, at which was represented a majority of the capital stock. At such meeting of the stockholders the proposal to execute the lease submitted by the trustees was approved by a majority of all the stockholders, and thereafter the trustees executed the lease in question. The lease was executed on the 6th of December, 1898, and included all the properties, smelting plant, buildings, machinery, and all property of every description, whether real, personal, or mixed, belonging to the Tacoma Smelting & Refining Company, and also included a provision for purchasing all ore and finished products and supplies then on hand, at its market value, to be thereafter inventoried and appraised, and for which $30,000 was afterwards paid in settlement of the lessor's liabilities. The lessee also covenanted that within six months it would expend at least $30,000 in making improvements and betterments on the smelting plant; that it would pay $5,000 per annum rental, together with taxes, insure the property, and at the end of the term return the property in as good conditon, wear and tear excepted, as when received. The resolution of the meeting of the stockholders of the Tacoma Smelting & Refining Company recites as reasons for the execution of the lease that the corporation was without sufficient capital to conduct its business at a profit, or in such a manner as to pay its operating and incidental expenses without drawing upon its capital, and that it was compelled to liquidate its affairs unless capital could be raised; that it had made diligent efforts to raise such capital, without success, until recently, when, through the manager, Mr. Rust, it had been able to arrange so that the business of the company could be continued, and the plant and property of the company preserved and maintained in good order and condition, upon the terms mentioned in the lease. The original plaintiff,

who was the owner of 150 shares of capital stock, appeared at such meeting, and protested against the execution of the lease on the ground that the company could not make such lease against the objection of a minority of its stockholders, and that such lease was against the best interests of the company and that of its stockholders; and a similar protest was made to the board of trustees before the execution of the lease. Prior to the execution of the lease the properties were under the management and in the possession of Mr. Rust and his assistants, under the direction of the trustees. The same managers remained, and are now in possession under the new company. It appears that prior to the execution of the lease the proposal of the new corporation to hold an option on three-fourths of the stock in the old corporation was superseded by the purchase of a majority of the stock in the old corporation at $15 per share, and the day after the execution of the lease the stock so purchased was entered upon the books of the new corporation, the Tacoma Smelting Company, as owned by the corporation. A large portion of this stock represented by Mr. Rust as trustee was voted at the stockholders' meeting of the old corporation when the trustees were authorized to execute the lease. Mr. Rust was the only witness who testified. He detailed the history of the old corporation. About 1892-93 it sustained considerable losses because of falling values in silver and lead. What the aggregate losses were is not stated with precision, but the company had borrowed about $50,000, for which it was liable, and it had no funds on hand. It appears that the operating expenses and salaries during the time had been paid.

1.   At the trustees' meeting there were present four of the board of seven,—Anderson, Oakes, Browne, and Rust, —of whom Rust was a promoter and trustee of the new corporation, and controlling a majority of the stock in the old company. Section 4257 Bal. Code, declares:

"A majority of the whole number of trustees shall form a board for the transaction of business and every decision of a majority of the persons duly assembled as a board shall be valid as a corporate act."

It is maintained by counsel for respondents that the statute makes every act of a majority of a quorum, when assembled, valid, and that the statute is merely confirmatory of the existing rule at common law. This view of the validity of such action seems to omit a consideration of the trust held by the director. Each occupies a fiduciary relation to the corporation and to each stockholder. He must faithfully perform his trust. The ordinary obligation attending trust relations attaches to the trustee of a corporation. The policy of the law forbids a trustee to assume a double function where there are adverse interests considered. 1 Waterman, Corporations, p. 612, observes that they cannot, as agents or trustees, enter into or authorize contracts on behalf of those for whom they are appointed to act, and then personally participate in the profits. Morawetz on Corporations lays down the rule that the utmost good faith is required in the exercise of the powers conferred on trustees. In *Munson v. Syracuse, etc., R. R. Co.*, 103 N. Y. 58 (8 N. E. 355), the court observed of a contract:

"But we are of opinion that the contract of September 14, 1875, is repugnant to the great rule of law which invalidates all contracts made by a trustee or fiduciary, in which he is personally interested, at the election of the party he represents. There is no controversy as to the facts bringing the case as to Munson within the operation of the rule. He and his associates were dealing with a corporation in which Munson was a director, in a matter where the interests of the contracting parties were or might be in conflict. The contract bound the corporation to purchase; and Munson, as one of the directors, participated in the action of the corporation in assuming the obli-

gation, and in binding itself to pay the price primarily agreed upon between the plaintiffs and Magee. He stood in the attitude of selling as owner and purchasing as trustee. The law permits no one to act in such inconsistent relations. It does not stop to inquire whether the contract or transaction was fair or unfair."

In *Curtin v. Salmon River, etc., Ditch Co.* 130 Cal. 345 (80 Am. St. Rep. 132, 62 Pac. 552), it was held that where, at a meeting of the directors of a corporation, a quorum being present, the execution of a mortgage on the property of the corporation was voted to one who constituted one of the quorum, the mortgage was invalid, because, the mortgagee's interest being antagonistic to the corporation, he was not a part of the board as concerned the mortgage, and hence there was not a quorum of the board present and acting. This conclusion was approved by the same court in *Bassett v. Fairchild,* 132 Cal. 637 (64 Pac. 1082). It was there observed of a resolution of the board of directors of a corporation allowing compensation to one of the board:

"In the opinion delivered in department it was held that the allowance of Fairchild's claim by the board of directors on November 9th was valid, notwithstanding the fact that the presence of Fairchild was necessary to constitute a quorum, and that, at all events, the allowance was an act that could be ratified by the stockholders, and that it was so ratified on January 10, 1893, as above stated. Since then it has been held in *Curtin v. Salmon River, etc., Ditch Co.,* 130 Cal. 345 (80 Am. St. Rep. 132, 62 Pac. 552), that there is no legal quorum of directors present when action is attempted to be taken on a matter as to which one of the directors necessary to make the quorum is interested."

While there are observations by some of the text writers and expressions in some judicial opinions refining upon acts which may be merely voidable, and not *per se* void,

where an interested trustee's vote is necessary to adopt, we think on principle, and in the better-considered cases, such acts, when consummated by the necessary vote of the interested trustee, are voidable upon complaint of a stockholder. It is not deemed necessary to determine further what weight the resolution of the majority of the stockholders and the subsequent declination of a legal quorum of the board of directors to refuse to continue the lease may have towards establishing the ratification of the resolution to lease.

2.   The objects of the incorporation of the Tacoma Smelting & Refining Company are stated in its articles to be the building, acquiring, owning, and constructing and operating of works and buildings for the purpose of milling, reducing, smelting, and refining gold and silver ores, purchasing and handling of such ores, advancing moneys thereon, and acquiring, purchasing, owning, and operating of such appliances and adjuncts as may be necessary or convenient for the prosecution of the business; the purchasing, owning, and acquiring of mines and all other lands that may be necessary or convenient in operating said business; and generally to do all other acts which, in the judgment of the trustees, may be proper or essential to the successful carrying on of the purposes and objects of the corporation. It is apparent that no express power to lease all the property of the corporation is contained in the articles. The articles of incorporation, as observed, are a contract. Each individual stockholder assumed the liability of the payment of his subscription to the capital stock in money or money's worth, and the corporation engages to carry on the business for which it is organized. Its business is managed by the board of trustees, but always within the fundamental limitations of the articles of incorporation. Morawetz, Private Corporations, § 511, observes:

"The authority of the board of directors is derived from the unanimous agreement of the shareholders, expressed in their charter or articles of association; and hence those powers which it is intended shall belong to the directors exclusively cannot be impaired by the majority, or any other agent. Each agent is supreme within the scope of the powers delegated to him by his principal. . . . A lease executed in pursuance of a resolution of the shareholders of a corporation was void, because the power of managing the business of the company was vested solely in the board of directors."

The stockholders have equal rights to participate in the profits of the business according to the value of the stock owned by each, and each stockholder is entitled to the protection of his charter rights. He may insist that the business be conducted according to the articles; and, while the wishes of the majority of the stockholders are potent in the administration of all the business of the corporation, and, where exercised without fraud or oppression, are controlling upon the minority, yet the action of the majority cannot prevail where it impairs the contract right of a stockholder. The reasons urged for the necessity of the lease in question are that the Tacoma Smelting & Refining Company was unable to procure capital to conduct its business efficiently; that it had liabilities which were pressing, and had no available funds to make payment. It may be well to suggest an inquiry into the condition of the corporation at the time the proposal to lease the property was made. It had a plant of considerable value. It apparently exceeded in value the liabilities, and, while the amount is not definitely shown, it appears that a large portion of the subscriptions to the capital stock had not been paid. Mr. Rust testified that some of the subscribers to the capital stock had been requested to advance capital to conduct the business, but that no such advancements had been made. It is nowhere intimated that the board of trustees had

attempted to exercise its appropriate powers to collect the unpaid subscriptions to the capital stock. In fact, it would seem, from the reasons suggested in the resolution adopted by the majority of the stockholders, that they did not desire this capital stock to be drawn upon in the prosecution of the corporate business. It cannot be concluded from the record before us whether other action by the board of trustees might not keep the corporation a going concern, and enable it to perform the objects of its organization. It may be implied from the testimony that a cogent reason for the action of the trustees was the enlargement of the smelting business by the organization of a new corporation, which should include within it the promoters and members of several large mining companies, so that the product of those mines could be brought to the smelter, and a much larger business established. The promoters of the new corporation and of the lease evidently desired to secure control of the stock in the old company. The acceptance of the lease seems to have been upon condition that the new company acquire a majority of the stock. It is urged that under the circumstances surrounding the transaction the trustees had the power to execute the lease. The authorities cited by counsel for respondents have been examined, and those most pertinent will be considered. In *Bartholomew v. Derby Rubber Co.*, 69 Conn. 521 (61 Am. St. Rep. 57, 38 Atl. 45), it was held that a manufacturing corporation organized under the joint-stock laws of Connecticut, located in the state, being unable to raise the capital necessary to continue its business with profit, might lease its plant for a term of ten years, with the privilege of purchase, and where it appeared that such lease was made in good faith, and was approved by a large majority of the stockholders, and contemplated the continuance of the same business under the lessee's management.

The suit was by a minority of the stockholders to annul the lease. The lease there seems to have been upheld upon the ground that the contract contained an option to the lessee to become the purchaser of the property, and the court held that it was competent for a business corporation to sell its property, pay its debts, divide its assets, and wind up its affairs. The case of *Hennessy v. Muhleman,* 57 N. Y. Supp. 854, was that of a corporation organized under the laws of West Virginia, and the purposes were acquiring and holding by purchase, lease, or otherwise mineral land and other property on Baranoff Island, Alaska, and elsewhere in the United States and territories, and it was held that the directors of the corporation had the power, without the unanimous consent of the stockholders, to lease the entire property of the corporation in consideration of a fixed rental and a certain portion of the metals mined on the lands. But the court observed:

"In the case now under consideration, the corporation was organized, not for the exclusive purpose of mining, as seems to have been assumed by the learned justice, but, as its charter declares, for the purpose of 'acquiring and holding, by purchase, lease, or otherwise, mineral land and other real property, . . . and to mine, transport, and dispose of the mineral and other products of such lands.' The company has acquired, and is now holding, by purchase, mineral land and other real property; and, while its charter permits it to conduct mining and other enterprises, there is nothing in the charter which makes it necessary that the company itself should do the mining, or that it should be done under its direction. . . . It has not disposed of its property, nor has it suspended the active life of the corporation."

*Ardesco Oil Co. v. North American Oil & Min. Co.,* 66 Pa. St. 375, was an endeavor to avoid a contract, and the court merely observed:

"The remaining errors complained of in the sixth and

seventh assignments may be considered together, namely, that the directors of the corporation, plaintiffs, had no power to make the lease sued on. It is supposed that a company chartered for the purpose of manufacturing and refining oil cannot lease its entire property and so defeat the very purpose for which its charter was granted. But corporations, unless expressly restrained by the act which establishes them or some other act of assembly, have and always have had an unlimited power over their respective properties, and may alienate and dispose of the same as fully as any individual may do in respect to his own property. Hence an insolvent corporation may make a general assignment for the benefit of its creditors, and this power may be exercised by the directors, unless special provision to the contrary is made in the charter. *Dana v. The Bank of the United States,* 5 W. & S. 223. If they can alienate absolutely, they may lease, which is but a partial or temporary alienation. *Omne majus continet in se minus.*"

Another and well-considered case is *Plant v. Macon Oil & Ice Co.,* 103 Ga. 666 (30 S. E. 567). This was a suit by minority stockholders to prevent the corporation from carrying into effect a lease of all its property and franchises for the term of one year. It was shown there that the Macon Oil & Ice Company was in failing condition, and liabilities were pressing for payment; that among the claims was one for ground rent, which was vigorously pressed; that it was absolutely impossible to run the oil mill; that the lease was temporary, in order to secure money with which to meet pressing claims; that the lease was under profitable terms to all the stockholders; that it was made solely for the purpose of relieving the company of temporary embarrassment; and that the manager of the Macon Oil & Ice Company was to remain at the company's office, and supervise its property, and look after its interests while paid for his services by the lessor. The court observed:

"Reason, as well as authority, we think, will sustain the position that neither a majority of stockholders nor the directors of a corporation as such, without special authority for that purpose, can generally do an act which, to all intents and purposes, terminates the corporation; that they could not, for instance, while the company was in a prosperous condition, upon their own mere caprice, sell out the whole source of their emoluments and abandon their enterprise, where a minority desire a prosecution of the business. . . . Upon a cursory glance at the authorities above cited, and a number of others we have investigated upon the subject, there would seem at first to be an irreconcilable conflict upon the powers and rights of a majority and a minority of stockholders in a private corporation, touching its authority to alienate or lease its property and franchises. But we think that nearly if not quite all of the authorities upon the subject can be reconciled, and that from a careful consideration of all of them together can be deduced the following principles: . . . (2) But a private corporation, limited as to duration, while doing a successful business, cannot sell out and abandon its enterprise, over the protest of a minority of its stockholders, who have the right to insist upon a continuance of its business. (3) While a minority of stockholders have the right recognized in the paragraph just above, it cannot compel a majority to continue indefinitely in the business of the corporation, provided a majority, in arrangements to discontinue the business, fully protect the interests of the minority by payment in full of the value of their shares, should it be demanded."

And the court observed, with reference to the contention that the right to rent for one year would involve the right to rent indefinitely, and thus permanently transferring the business, that, "should a scheme of this sort in the future be attempted without the necessity for such alienation, plaintiffs could doubtless then have redress of their grievances." But, on the other hand, there are well-adjudged cases holding that a lease of all the property of a corporation cannot be made. That the stockholders can-

not make such lease is ruled in *Copeland v. Citizens' Gas Light Co.,* 61 Barb. 60. In *Small v. Minneapolis Electro-Matrix Co.,* 45 Minn. 264 (47 N. W. 797), the Minneapolis Company leased its property to the Electro-Matrix Company to carry on the same business, and the lease was ratified by a majority of the stockholders. The court observed:

"We do decide that such a surrender of the property, and, so far as possible, of the functions, of a corporation, in order that, while it is to still continue in existence, its business may be carried on by another corporation, to which such transfer is made, would violate the rights of a nonassenting stockholder arising from the contract, implied, if not expressed, in the creation of such an organization, and he would be entitled to have such acts restrained by injunction."

The same declaration is made in *Black v. Delaware & R. Canal Co.,* 24 N. J. Eq. 455. In *Byrne v. Schuyler Electric Manufacturing Co.,* 65 Conn. 336 (31 Atl. 833), a corporation was organized for the purpose of succeeding to and carrying on the business of an insolvent corporation. The court declared that this could not be done; that such a transfer would be sustained only when the purpose was a *bona fide* winding up of the business of the existing corporation, and that any dissenting stockholder could maintain an action to enjoin such a disposition of the corporate property. A distinction may be observed between a sale of all the property and a lease of all the property. In that of a sale no further liability rests upon the stockholder. The corporation is in fact discontinued. In that of the lease the business is discontinued, and the profits derived by the lessee, but the stockholders' obligations may continue. Under our statutes the corporate existence is limited in time. This was not usual in the older cases. And, further, § 4275, Ballinger's Code, contains the com-

plete procedure for the dissolution of the corporation at the will of two-thirds of the stockholders. These statutes apparently contemplate the conduct of the business for which the corporation is organized through its own appointed agencies, or, at the choice of two-thirds of the stockholders, a dissolution. It is true, an insolvent corporation may make an assignment for the benefit of its creditors against the will of a nonconsenting stockholder, and probably any appropriate proceedings in equity might be taken to relieve a failing corporation by such disposition of its property as should be equitable, which did not violate any contractual relations of the stockholders. It is concluded upon the whole record presented here that the lease in controversy is voidable at the suit of a nonconsenting stockholder.

3. As has been observed, the new company holds a majority of the stock of the old company. Some confusion arises upon the investigation into the right of one corporation to hold stock in another, or become a member thereof, when the inquiry is made into prohibitions upon the powers of a corporation, rather than directed to the enumeration of powers conferred upon it. It has always been true that corporations have only such powers as are granted to them by the state, and, when a corporate act is questioned, the affirmative is upon the corporation to show its authority. It is not entirely correct to draw a right line between corporations which are *quasi* public and another class designated as private. The state will more readily interfere, perhaps, when the duty of a corporation is public than when it is merely a trading, or manufacturing, or commercial company; but we apprehend that the rights of stockholders are equally protected in both. It was said by this court in *Spokane v. Amsterdamsch Trustees Kantoor*, 22 Wash. 172, 179 (60 Pac. 141):

"It may also be further observed that a corporation cannot enlarge its powers beyond legislative grant by any statement in its articles of incorporation. The corporation may be differentiated from the natural person thus: The natural person may make any contract or do any business not inhibited by law or public policy. The corporation cannot make any contract or do any business except as authorized by legislative grant."

Morawetz, Private Corporations, § 431, says:

"A corporation has no implied right to purchase shares in another company for the purpose of controlling its management. Nor may a corporation hold shares in another company as an investment, unless this be the usual method of carrying on its own proper business."

And in § 434 it is further said:

"Shares in a corporation, which have been purchased by the company itself, either in its own name or the name of a trustee, cannot be voted on by either the trustee or the company's officers."

Thompson, Corporations, § 6405, states the rule:

"One corporation has no power, in the absence of an express grant, to purchase the shares of another corporation for the purpose of owning, possessing, and controlling its property and business." Where such corporations have such power, he says, they hold such shares "only as the owners of paper securities, and not as stockholders or corporators in the corporation whose shares they are; and, consequently, they do not acquire the right to vote in respect of such shares at corporate elections. In the absence of an enabling statute, authorizing the formation of a corporation with such powers, it cannot acquire them merely by assuming them in its articles of incorporation." In *First National Bank v. National Exchange Bank*, 92 U. S. 122, it was said:

"Dealing in stocks is not expressly prohibited, but such a prohibition is implied from the failure to grant the power."

See, also, *California Bank v. Kennedy,* 167 U. S. 362 (17 Sup. Ct. 831); *Franklin Bank v. Commercial Bank,* 36 Ohio St. 350 (38 Am. Rep. 594); *People ex rel. Peabody v. Chicago Gas Trust Co.,* 130 Ill. 268 (17 Am. St. Rep. 319, 22 N. E. 798). It was determined by this court in *Denny Hotel Co. v. Schram,* 6 Wash. 134 (32 Pac. 1002, 36 Am. St. Rep. 137), that a corporation could not subscribe for the capital stock of another. Our statutes cannot be said to authorize such ownership of stock any more than the authority to subscribe for capital stock. The expression of such power in the articles of incorporation of the new company, as has been observed, cannot extend the corporate powers beyond those expressed in the statutes. It appears that appellants are entitled to have the lease adjudged void, and, further, that the stock of the Tacoma Smelting & Refining Company owned by the new company shall not be used in voting at stockholders' meetings in the old company.

The judgment is reversed, with direction to the superior court to adjudge the lease void, and that it be canceled, and that the Tacoma Smelting Company be enjoined from voting the stock held by it in the Tacoma Smelting & Refining Company.

DUNBAR, FULLERTON, ANDERS and WHITE, JJ., concur.