Coler *v.* Tacoma Railway and Power Co.

WILLIAM N. COLER, JR.,

*v.*

TACOMA RAILWAY AND POWER COMPANY et al.

[Filed November 24th, 1902.]

1. The charter of the defendant the Tacoma, &c., company, a New Jersey corporation, declared one of its objects to be "to acquire, build, construct, own and operate outside of the State of New Jersey railway properties of all kinds and descriptions and with any kind of motive power, and to sell and lease the same." Another object was "to acquire, by purchase or otherwise, the stocks, bonds and other evidences of indebtedness of persons, firms or corporations, * * * and unlimitedly to hold, purchase, mortgage and convey real and personal property of any kind or description in any state or territory of the United States." The by-laws of the company provided that "with the consent, in writing, and pursuant to a vote of the holders of a majority of the stock issued and outstanding, the stockholders having been formally convened in a meeting, the directors shall have power to sell, mortgage or otherwise dispose of the whole property of the corporation." The company acquired and operated an electric street railway system in the city of Tacoma, in the State of Washington, and, pursuant to the by-laws, the stockholders authorized a sale of the railway and entire property of the company to a Washington company, to be paid for by stock of the Washington company to be issued to the New Jersey corporation.—*Held,* that this sale and transfer was authorized under the Corporation act (section 6) making it lawful to form a company to construct and operate railroads outside of this state, and (section 7) authorizing it to hold and convey real and personal property out of this state, provided such powers are included within the objects set forth in its certificate.

2. At the meeting of stockholders which approved the sale, resolutions were also passed for the dissolution of the New Jersey company. The dissolution of the company and the distribution among its stockholders of the stock or its proceeds was part of the entire plan, but the resolution for dissolution was a separate and distinct resolution of the company. This resolution was ineffective because of failure to give the notice for the meeting required by the statute. The directors propose to carry out the resolution for sale independent of proceedings for dissolution.—*Held,* that the separate and distinct resolution for sale still remained effective, and the powers of the directors as to the terms of sale under the charter and by-laws were not to be governed by the provisions of the Corporation act (section 54) restricting a sale after dissolution to sales for cash or part credit on mortgage.

3. The circumstance that the stock of the Washington company, if received by the New Jersey company, would become subject in its hands to its mortgage previously given on existing and subsequently acquired property, is not an equitable reason for enjoining the sale.

4. Under the laws of the State of Washington, the Washington company had legal authority to issue full-paid stock for the purchase, on a valuation fixed in good faith by the directors, and when so issued, the stock is not assessable for the debts of an existing creditor or of a subsequent creditor with notice. (Statutes and decisions of Washington examined.) The sale therefore should not be enjoined because of this alleged liability.

5. The Corporation acts of Washington do not expressly authorize the purchase by one corporation of the stock of another, and the courts of Washington have decided that a corporation created under their law has no power to purchase the stock of another similar corporation or to vote upon such stock if purchased.—*Held*, (1) that the New Jersey corporation having the power under its charter to purchase the stock of a Washington corporation, its power to make the purchase and vote on the stock in the State of Washington depends upon the law or rule of comity between the states, which law or rule authorizes the purchase, unless it has been affirmatively declared by the constitution, statutes or decisions of the courts of Washington to violate its public policy; (2) the decisions of the courts of Washington construing the statutory powers of its own corporations to purchase stock of its own corporations and vote thereon, are not to be taken as decisions on its public policy under this law of comity, and in the absence of any provision by the constitution, statutes or decisions by its courts, affirming that such purchase by a foreign corporation of the stock of a domestic corporation is against its public policy, the general law of comity will govern. The purchase of the stock is valid, and the New Jersey company will have the right to vote thereon.

6. The advisability of the sale in its business aspect is, in the absence of fraud, a matter for the decision of the stockholders and directors, and upon all the affidavits, it is considered that no such case of fraud is made out as entitles the complainant to a preliminary injunction. *Donald* v. *American Smelting and Refining Co., 17 Dick. Ch. Rep. 729* (*Errors and Appeals, 1901*), distinguished.

On application for preliminary injunction, heard on bill and affidavits and answer and affidavits.

*Mr. Chandler W. Riker* and *Mr. Adrian Riker,* for the complainant.

*Mr. Richard V. Lindabury,* for the defendants.

Coler v. Tacoma Railway and Power Co.

EMERY, V. C.

The substantial situation on this application is this: Two corporations, owning two separate electric street railways in the State of Washington, propose to combine their properties and to capitalize the combined roads at an amount equal to the present capitalization of the two roads. One of the systems is operated entirely within the city of Tacoma, and the company owning and operating this road is a New Jersey corporation, the corporate defendant the Tacoma Railway and Power Company. The other company has constructed, or nearly constructed, a railroad between the cities of Seattle and Tacoma. This corporation is incorporated under the laws of the State of Washington, and is the Seattle and Tacoma Interurban Railway. It is not a party to this suit. The two companies, for the purpose of avoiding competition or controversies within the city of Tacoma, have already a tracking or traffic right agreement as to running the interurban traffic on the Tacoma company line. This arrangement was made by the New Jersey company when the Washington company proposed to secure independent routes in the city of Tacoma. The conditions and the operation and proposed operation of the two lines and their branches are such that, in the judgment of the stockholders and directors of both companies, their substantial ownership and operation should be vested in one company. The legal form by which the transaction is to be carried into effect is that of a sale and conveyance by the New Jersey company to the Washington company of all the property and assets of the New Jersey company (except its franchise to be a corporation), in return for which the New Jersey company is to receive common stock of the Washington company to an amount equivalent to the New Jersey company's stock—$2,000,000. The present capitalization of the interurban company is, bond debt, $1,350,000; preferred stock, $500,000; common stock, $1,500,000; total, $3,350,000. The capitalization of the New Jersey company is, first mortgage bonds issued, $1,310,000; second mortgage bonds issued, $114,812.50; capital stock (common), $2,000,000; total, $3,424,812.50. The Washington company proposes to issue $2,000,000 of common stock for the purpose of making the purchase of the New Jersey

company's property, and the proper steps for increasing its capital, under the laws of Washington, have been taken. As a part of the plan, the Washington company is to issue a new funding mortgage for $5,500,000, which will be subsequent to the New Jersey company mortgages on its property conveyed, but as all of the bonds to be issued under this new mortgage are for the purpose of retiring outstanding bonds of the two companies secured by existing mortgages, or of securing additional money to be expended for improvements, extensions and additions to an amount equal to or exceeding the bonds to be issued, this provision as to the new mortgage is not material on the questions now presented. These questions arise out of differences between complainant and defendants as to the valuation and capitalization of the properties of the two companies.

All of the increased capital stock of the Washington company is at present practically owned or controlled by one Miller, to whom it is to be issued, and the offer to purchase the New Jersey company property is made by him. He is to deliver the stock of the Washington company therefor upon the conveyance to his nominee, the Puget Sound Electric Company, which is the name to be assumed hereafter by the Washington company. Owners of sixteen thousand four hundred and forty-two shares of the total number of shares (twenty thousand) in the New Jersey company, consent to the sale, and all of its directors approve and recommend the sale as advantageous. Complainant, who is the owner of seven hundred and eighteen shares in the New Jersey company, seeks to enjoin the sale as illegal and *ultra vires* of the New Jersey company, and also as fraudulent against the minority or non-assenting stockholders. So far as relates to the purely business aspects of the transactions, I am satisfied, after considering all the affidavits, that there is no reason to attack or impugn the good faith of the directors of the New Jersey company, and I see no reason to restrain the sale for the purpose of fuller investigation at final hearing so far as the transaction involves the question of good faith.

The main fact upon which complainant relies in challenging the good faith and honest judgment of the directors in the transaction is the difference between the present and probable com-

parative earning capacity of the two roads. The New Jersey company's line is altogether within the city of Tacoma and its travel is claimed to be increasing, and it is claimed that in the not distant future dividends upon its stock to the amount of five per cent. may be earned. The Washington company, connecting the two cities, has just been constructed; its carrying power has not been demonstrated and it is claimed by complainant that by reason of the sparsely settled country through which it runs, it will probably be unable to meet its fixed charges. The affidavits filed by the defendant show, or tend to show, on the other hand, that the road of the New Jersey company was constructed about ten years ago, and that its physical condition and equipment are such as to require the expenditure of large sums in order to operate it profitably; that the interurban line is new and well constructed, and that the district through which it runs may fairly be expected to give a valuable patronage both for passengers and freight, and that it is so situated, with reference to exercising its franchises in Tacoma, that unless operated in combination or connection with the New Jersey company it will be able to bring about a competition or rivalry with the New Jersey company for the Tacoma travel which will be disadvantageous. These and other considerations of a like character, urged by the respective parties, plainly relate to the business aspect of the proposition for sale. The directors of the New Jersey company unanimously declare their opinion that the sale is one which is beneficial to their company and should be carried out. These directors are business men, many of them of high standing, and represent in the board stockholders of the company who own the majority of the stock in the company, and who are able to protect its interests; and as they own no stock or interest in the Washington company and control the policy of the New Jersey company, their judgment must be taken to be influenced and controlled solely by the interest in the New Jersey company and its stockholders. The claim made by the bill that the directors are controlled by the same interests as the Washington company is shown by the defendant's affidavits to be unfounded. Under these circumstances, I think, no such ground for interfering with the sale, upon the ground of bad

faith or fraud in the directors, has been made out as will entitle this court to decide upon the question of the propriety of the sale in its business aspects, and the only question which the court is called on to settle is that of the power of the company and the directors to make the sale. If the New Jersey company and its directors have the power to carry out the sale and to hold the stock of the Washington company with the same powers as other holders of the stock, this court should not interfere with their judgment in making the sale and receiving the stock. The power of the New Jersey company to make a sale of its property in a foreign state depends, first, upon the powers under the Corporation laws of New Jersey and its charter thereunder; and second, upon its powers under the laws of Washington, where the property to be conveyed is located. The charter of the company confers very broad powers in reference to sales of the company's property. Among the many *objects* for which the company is formed is the following:

"To acquire, build, construct, own and operate outside of the State of New Jersey railway properties of all kinds and descriptions and with any kinds of motive power, *and to sell and lease the same.*"

Another of the *objects* of incorporation is

"to acquire, by purchase or otherwise, the stocks, bonds and other evidences of indebtedness of persons, firms or other corporations, and to sell, mortgage, pledge or otherwise dispose of such stock, bonds or other evidences of indebtedness * * * and unlimitedly to hold, purchase, mortgage and convey real and personal property of every kind and description in any state or territory of the United States."

Our Corporation act (section 6) makes it lawful "to form a company for the purpose of constructing, maintaining and operating railroads outside of this state," and authorizes (section 7) any corporation of this state to

"conduct business in other states and to hold, purchase, mortgage and convey real and personal property out of this state, provided such powers are included within the objects set forth in its certificate of incorporation."

Coler *v.* Tacoma Railway and Power Co.

In reference to the sale of the entire property of the company, the charter provides (seventh (*b*) :

"With the consent, in writing, and pursuant to a vote of the holders of a majority of the stock issued and outstanding, and not otherwise, the stockholders having been formally convened in a meeting, the directors shall have power to sell, assign, transfer, mortgage, or otherwise dispose of the whole property of the corporation."

This consent, in writing, has been given, and, so far as relates to the power given under the laws of New Jersey, the transaction now questioned seems to come plainly within the powers expressly given to the directors by the charter, and expressly contemplated by the charter. The company owns and operates a railway outside of New Jersey, and proposes to execute one of its express charter objects, in the sale of the same, and by this sale to acquire the stock of the Washington company.

The terms of the offer which is made by Miller to the New Jersey company are, in this respect, as follows:

"I will pay for the property and franchises of your company $2,000,-000 in the common capital stock of the Puget Sound Electric Railway at par, and will deliver to you the undertaking of that company to assume and pay all the debts and obligations of your company, and to save harmless the stockholders and directors of your company against any liability arising out of any claim against your company, or out of the sale and transfer herein proposed, or out of the disposition of the proceeds thereof."

The Puget Sound Electric Railway is designated by Miller as his nominee to receive the transfer of the New Jersey company property. The agreement for sale seems to contemplate the delivery by the purchaser to the New Jersey company of all the stock of the Washington company, and not an exchange of the stock of the individual holders for the stock of the Washington company. There is a further provision in the offer that

"if any stockholder of your [the New Jersey] company objects to the acceptance of this offer and is unwilling to exchange his stock of your company for an equal number of shares of the stock of the Puget Sound Electric Railway [the new name of the Washington company], I will pay to you in cash $35 for each share of the stock of your company be-

longing to such stockholders in lieu of a number of shares of the stock of the Puget Sound Electric Railway equal to the number of shares of the stock of your company owned by such stockholder."

Taking the entire arrangement for payment in stock or in cash, it seems to be one by which the purchaser pays to the New Jersey company, and not to the individual stockholder, by way of exchange, the entire amount of the purchase price in stock. The further provision is then made to pay to the company $35 in cash for each share of the stock of any stockholder who does not wish to exchange his stock for stock of the Washington company. These shares of the New Jersey company so purchased for $35 each are to be delivered, as I take it, to the purchaser, and he will then hold the stock just as any other holder. The agreement for purchase does not expressly undertake to provide for the distribution of the stock received on the sale among the holders of the New Jersey company, by way of exchange or otherwise, but as between the New Jersey company and its stockholders it was proposed, as part of the entire plan, to dissolve the corporation and to distribute among the stockholders either the stock or its proceeds. Proceedings for such dissolution of the New Jersey company were taken, *pari passu,* with the proceedings to authorize the sale of the company's property, and resolutions approving the sale and for the dissolution of the company were passed at the same meeting. The resolutions were, however, distinct, and were separately passed, and the resolution approving the sale was passed first. The resolution for dissolution is admitted to be ineffective, by reason of the failure to give the statutory notice of the meeting. The answer, however, states

"that if the proposed sale of the property and franchises of the company is consummated, there will be no further occasion for the continuance of the corporate existence of the said company, and that the directors thereof will recommend to the stockholders the dissolution of the company, if the proceedings for that purpose should not be effective, * * * but in view of the fact that the company has not yet been dissolved, these defendants cannot now say what course will be adopted in that behalf, and that it is not the intention of the company to accept in payment of the property and franchises a sum less than the full value of such property and franchises, and that the consideration for the sale of said property is to be distributed among the stockholders of the Tacoma

Railway and Power Company, and no part of it is to remain an asset to be mortgaged by the Puget Sound Electric Railway or the Seattle-Tacoma Interurban Railway to secure any bonds whatever."

The position taken by the answer and by defendants' counsel at the argument that the proceedings to authorize the sale are separate and distinct from the proceedings for dissolution is, I think, correct.   That the two proceedings are technically and in form separate and distinct is not, as I understand, contested by complainant, but the contention is that the sale of the company's entire property for stock of a new company was intended solely as the first step in a proceeding for final dissolution of the company, and (following such dissolution) a distribution of the stock of the purchasing company among the stockholders of the New Jersey company, as the distribution of the assets of the company.   This being the ultimate object to be accomplished, it is insisted that the *status* of the case, on the present application, must, in this feature of it, be considered in the same light that a sale of the property by trustees on dissolution is to be considered, and that such sale being made for the purpose of winding up, cannot, under our Corporation act, be made for shares of stock.   Under the act (section 54) the directors are trustees for settlement of the corporation's affairs,

"and may prescribe the terms and conditions of the sale of such property and may sell all or any part for cash, or partly on credit, or take mortgages and bonds for part of the purchase price for all or any part of said property."

My view is that this provision of the act as to credit would not include the right to sell for shares in a new company organized to take the assets, with a view of distributing these shares among the stockholders, and that the stockholder could not be obliged to share in such new enterprise if he did not wish to. In the cases of such sales to new companies of the assets of a company on dissolution which have come before me, and any stockholder or creditor has objected to receiving the shares in the new company, I have refused to approve sales of the assets for stock in a new company, except upon the terms that as to every stockholder or creditor not desiring to take stock as his

share on distribution, the purchaser must, as to such dissenting stockholder or creditor, pay in cash the same amount offered in stock, and that the total amount thus offered in stock is the fair value of the property in money. And if the *status* of the present case was that of a proposed sale by trustees on dissolution, I should consider that a stockholder who declined to accept shares in the new company in satisfaction of his rights in distribution, must be offered in cash the par value of the new stock, and that an offer of only thirty-five per cent. in cash of the par value could not be sufficient. In other words, so far as the court of chancery, in its control over the liquidation of corporations, insolvent or otherwise, has any right of review over fixing the basis of capitalization of the new company, it can only approve a capitalization on the basis of the actual present value in money of the property conveyed.

But the present case is not a sale by trustees on dissolution, nor do I think it can be so treated. It is a sale expressly authorized by our statutes and the charter of the company, in carrying out one of the express objects for which it was incorporated, viz., the sale of a road owned and operated in a foreign state under its charter; and, on the sale, another of the objects of the company is effected, viz., the acquiring of the shares of stock in another corporation. The sale has been approved by more than the proportion of stockholders required by the charter, and the consideration is to be received by the company, which, upon the sale, will hold the stock as its property for the equal benefit of all stockholders. There is no question of bad faith on the part of the directors which would justify me in enjoining the sale pending further inquiry on that point at final hearing, and the directors of the company must be allowed to carry out the sale, unless the other objections to the proposed sale, based on its invalidity as a sale by the New Jersey company as a going concern, and for the purpose of receiving the proceeds under its charter, are held to be valid. One of these objections is that the stock of the new company when received by the New Jersey company will at once become, in the possession of the New Jersey company, subject to its mortgages already given to the Old Colony Trust Company, which cover

"the property of the Tacoma Railway and Power Company, real, personal and mixed, whether now held or hereafter acquired by it, together with * * * stocks, bonds and other securities, contracts, claims and demands of the Tacoma Railway and Power Company, whether now owned or hereafter acquired."

It may be that the Old Colony Trust Company, upon the consummation of the proposed sale, might be entitled under its mortgage to require the delivery to it of the shares of stock as covered by the mortgage, but the ownership of the stock in such case would still be in the New Jersey company, subject to the mortgage. Complainant's objection to this result is based on the view that distribution of the stock among the stockholders is thus prevented. This may be a consequence of the proposed sale which the directors are to consider, but as the mortgage debts have not been paid, I fail to see how it can be urged as a valid objection to the sale, except upon the theory that the court is to enjoin the mortgagor company against improving the security for the debt, and is to assist in making a distribution of the assets of the company before its debts are paid. If the company is dissolved, all creditors, including the trustee mortgagee, will have an opportunity to prove their claims under the statute, and a distribution made without providing for the payment of these debts would or might subject directors to a personal liability for the debts, and stockholders to the return of the assets, if necessary, for payment of the debts. It cannot be assumed that the directors, if the company is dissolved after the sale, will distribute the assets of the company among the stockholders, except under the authority and protection of the statutes.

Another objection taken to the proposed sale is that the stock of the Washington company to be received by the New Jersey company on the sale of its property, although issued as full-paid stock, will not be fully-paid stock, because of the overvaluation of the property, and that under the laws of the State of Washington the stock received for the sale will be hereafter liable to assessment for the payment of the debts of the Washington company. The proof of the fact that the stock is to be issued at an overvaluation mainly relied on is that only $35 in cash per share of $100 par value are offered to stockholders who do not wish to

exchange their stock on the par basis. As to the other proofs relating to the overvaluation of the New Jersey company's property, the complainant's affidavits tend to show that the property has a value and earnings, present and prospective, which make its own stock worth much more than $35 per share, while the proofs filed by defendants on this point tend to show that this is its full cash value. Defendants claim, moreover, that this question of valuation of the property conveyed in payment of stock is one which, under the laws of the State of Washington, is to be determined by the directors, and that in the absence of fraud their judgment is final and conclusive, not only as to the company and its stockholders, but as to creditors, either existing or subsequent, of the company whose stock is issued. Upon examination of all the cases and statutes of the State of Washington referred to by counsel, the conclusions I reach as to the laws of that state, in reference to the power to make the sale and the assessability of the stock, are as follows:

*First.* The power of the Washington company, under the laws of Washington, to receive the conveyances, seems to be clear, under the provisions of their Corporation act (*1 Hill Stat. & C. §§ 1497, 1500*) which authorizes corporations to be formed for the purpose of building, equipping and running railroads; or engaging in any other species of trade or business, and when formed, to purchase, hold, mortgage, sell and convey real and personal property. The power of the New Jersey company to transfer its railroad or other real estate in Washington is covered by the provision (*Ibid. § 1524*):

"Any corporation incorporated under the laws of any state in the United States for any of the purposes for which domestic corporations are authorized to be formed, shall have power * * * to acquire, purchase, hold, mortgage, sell, convey or otherwise dispose of, in the corporate name, all real or personal property necessary or convenient to carry into effect the objects and purposes of its corporation * * * and generally to do and perform every act and transact every kind of business within this state in the same manner and to the same extent as corporations incorporated under its laws are authorized to do; * * * provided, however, this shall not be so construed as to allow such foreign corporations to transact business within the state on more favorable conditions than are prescribed by law for a similar corporation organized under the laws of this state."

Coler v. Tacoma Railway and Power Co.

*Second.* Corporations of the character of the Washington company may issue full-paid stock for property purchased. *Turner v. Bailey, 12 Wash. 634 (1895).* In *Manhattan Trust Co. v. Seattle Coal and Iron Co., 19 Wash. 493 (1898),* it was said (at *p. 953*) : "The rule is too firmly established in this state to be called in question that property may be taken in payment of shares of stock of corporations generally." The provision of the constitution, article 12, section 6, that "all fictitious increase of stock or indebtedness shall be void," does not seem to have ever been held applicable to make void the issues of stock for property purchased.

*Third.* As between the company issuing stock as the vendee of property, and the vendor, the valuation placed upon the property and stock by the parties is, in the absence of fraud, binding and conclusive, as in the case of any other purchase. *Adamant Manufacturing Co. v. Wallace, 16 Wash. 614 (1897).* Under this rule either party may, as I understand, attack the contract of sale for fraud in the other party and for the purpose of rescission. And as the vendor in the present case is a corporation whose directors are, in respect to the sale, trustees of the complainant and other stockholders, and the directors, as such trustees, are bound to exercise an honest judgment in reference to the sale, the complainant, if he could show, on the part of his trustees, a fraudulent *undervaluation* of the property conveyed, and that the consideration to be received was fraudulently put too low, he would be entitled, I think, to enjoin the sale. So far as relates to the amount of the stock (par value) of the Washington company to be received by the New Jersey company, complainant claims that the property of the latter is overvalued, not undervalued. The claim of undervaluation of the New Jersey company's property refers to relative values and rests on the charge that the existing property of the Washington company is worth nothing beyond its bonded debt and preferred stock; that its existing common stock—$1,500,000—is worthless, and it is therefore claimed that the increased stock—$2,000,000— which is to be issued to the New Jersey company for its property will be depreciated by reason of the participation of this alleged worthless $1,500,000 common stock of the Washington

company in the ownership of the property conveyed. So far as relates to the companies concerned and their respective directors and stockholders (and leaving out of view for the present any question as to the creditors of either company), the whole question is one of the relative valuation of the property of the two companies proposed to be united in their operation by this sale. On this question and as between these interests the judgment of the directors, approved by the stockholders, as required by the charter, must be conclusive, in the absence of fraud; and this court cannot, in the absence of fraud, undertake to revise this judgment of the owners and managers of the property.

*Fourth.* A subscription for capital stock creates under the laws of Washington a contractual obligation to pay for the amount of stock either money or money's worth to the full par value of the stock. As to such subscriptions for stock the estimate of the value placed upon the property by the corporation is not conclusive upon the courts. And, in favor of subsequent creditors of the company, the contractual obligation will be enforced. *Manhattan Trust Co.* v. *Seattle Coal and Iron Co., 19 Wash. 493 (1898)* ; *Dunlap* v. *Rauch, 24 Wash. 620 (1901)*.

*Fifth.* Where stock of a corporation (other than the stock originally subscribed for) is issued in payment for property honestly believed by the parties to be of the par value of the stock, a subsequent creditor must show that the purchase at the price agreed on was made in bad faith. And if such subsequent creditor had knowledge or was put upon inquiry as to the terms of the issue of the stock, no fraud upon him will be imputed, and, as to him, the stockholders receiving full-paid stock for property purchased will not be held liable for further payment on the stock. *Adamant Manufacturing Co.* v. *Wallace, 16 Wash. 614 (1897)* ; *Manhattan Trust Co.* v. *Seattle Coal and Iron Co., 19 Wash. 493 (1898)*.

The liability of the stock to assessment would therefore, under the decisions of the supreme court of Washington, depend (1) upon the bad faith of the directors and the intentional overvaluation of the property for which full-paid stock is to be issued, and (2) upon the existence of a subsequent creditor who did not know or was not put upon inquiry, that the stock was issued

Coler v. Tacoma Railway and Power Co.

as full paid-up stock for the property purchased. Neither of these conditions is shown to exist in the present case, and in the absence of any such clear proof of fraud on the part of the directors in relation to the valuation of the property, as to justify the arrest of the proceedings *in limine,* the directors, with the approval of the stockholders, are entitled to carry out the sale upon the valuations which seem to them honest and beneficial, leaving to them, as representing the company, the defence and support of the valuation if it be hereafter attacked by any creditor entitled to call it in question. I find no case authorizing an existing creditor, whose debt was not created in reliance upon the subscription or valuation, to question the valuation made between the parties to the purchase. The other objections to the transactions raised either in the bill or by counsel at the hearing, relate substantially to the advisability of the sale in a business point of view, and, in the absence of fraud, these questions, as I have said, must be left to the final decision of the stockholders and directors, under the rule so constantly applied in such cases. The decision in *Donald* v. *American Smelting and Refining Co., 17 Dick. Ch. Rep. 729 (Errors and Appeals, 1901),* strongly relied on by the counsel for complainant as giving the court the power to review the judgment of the directors, does not apply to this case. In that case the statute of this state, as construed by the court, gave to the stockholders of the company whose stock was proposed to be issued for property at an alleged overvaluation the right to have the value of the property ascertained by the court before the transaction was consummated by the issuance of the stock, if a proper case for inquiry as to valuation was shown. In the case in hand all of the stockholders of the purchasing company consent to the issuance of the stock, and the real question is whether the valuation made by the directors of the vendor company, with the approval of the stockholders, is a breach of the duty of the directors to the company and all its stockholders, including complainant. This is a question clearly of bad faith.

Another question arises out of the late decision of the supreme court of Washington in *Parsons* v. *Tacoma Smelting and Refining Co., 25 Wash. 492 (July, 1901),* to which I have called the

attention of counsel on both sides since the argument, and upon which I have received briefs. One of the points involved in this case was whether a corporation of the State of Washington (called the new company) which had bought the majority of the stock of another Washington company (called the old company) was authorized under the laws of Washington to vote on this stock of the old company so purchased, at a stockholders' meeting of the old company. The stock, although owned by the purchasing or new company, and carried on its books as its property, seems to have been carried in the name of one of its officers, as trustee, and as such holder he voted on the stock at a stockholders' meeting of the old company called to vote upon the question of ratifying a lease made to the purchasing company by the other company. The charter of the new company seems to have authorized the purchase of the stock of the old company, but the statutes of Washington did not expressly authorize such purchase. One question involved was whether the new corporation had the right to vote on this stock so purchased. The opinion of the chief-justice of the supreme court, unanimously concurred in by three other judges, declared that the power to own the stock of another corporation must be expressly conferred by statute; that the statutes of Washington did not authorize such ownership, and that the expression of the power in the articles of incorporation of the new company could not extend the corporate powers beyond those expressed in the statutes. And it was therefore held that the stock of the old company owned by the new company could not be used in voting at stockholders' meetings in the old company; and an injunction against such use was granted. Under this decision the questions fairly arise (1) whether under the laws of Washington the New Jersey company could hold or vote upon the stock of the Washington company, and (2) if it could not, whether the sale should not be enjoined.

In reference to the first question, it is to be considered that the New Jersey company, by the Corporation laws of this state (*Corp. act 1896 § 51*), has power to purchase the securities of corporations of any other state, and that by the terms of its charter such purchase is one of the objects of its incorporation. The shares of stock of the Washington company are, by the stat-

utes of Washington (*1 Hill Stat. & C.* ¶ *1506*) declared to be
personal estate.  A settled rule of American jurisprudence, re-
laing to the contracts and acts of a corporation of one state made
or performed within another, is that a corporation created by
one state may exercise the powers conferred by its charter within
the boundaries of another state, but only by the comity and con-
sent of the latter state.  This comity is a comity between the
different states, not between the courts of the states, and has
been exended to apply to the exercise, within a foreign state, of
such powers, under its charter, as do not contravene the public
policy of the state in which they are sought to be exercised.  The
leading case declaring these general principles is *Bank of Au-
gusta* v. *Earle, 13 Pet. 519, 589, &c.* (*United States Supreme
Court, 1839*), and the later cases are collected in the text-books
and digests.  *6 Thomp. Corp. Off. 7882, 7885; 13 Am. & Eng.
Encycl. L. (2d ed.) 837, 839; 2 Morawetz Corp.* ¶ *961, &c.*

In these respects each state settles for itself its own public
policy, and the policy of any state is to be ascertained from its
constitution, statutes and the settled adjudications of its courts.
That these are the ultimate and the only sources by which the
court of one state or jurisdiction can ascertain the public policy
of another state or jurisdiction has always been the accepted doc-
trine in American courts.  The reason was declared by Mr. Jus-
tice Story in the *Girard Will Case* (*Vidal* v. *Girard's Executors,
2 How. 127, 197, 198* (*1844*) as follows: "The question, what
is the public policy of a state and what is contrary to it, if in-
quired into beyond these limits (its constitution and laws and
judicial decisions), will be found to be one of great vagueness
and uncertainty and to involve discussions which scarcely come
within the range of judicial duty and functions, and upon which
men may and will complexionally differ."  This limitation was
expressed, it is true, where the question was whether the support
of the Christian religion was part of the public policy of a state,
but it was based on the fundamental nature of the question of
the public policy of a state and its judicial ascertainment by the
courts of another state.  The rule has therefore been applied to
all classes of cases, and especially to cases involving the exer-
cise of powers by foreign corporations within another state.

*Bank of Augusta* v. *Earle, supra.* And in this class of cases the further principle has been declared that the public policy of a state, restricting a foreign corporation from acquiring or holding property or transacting business within its limits must be expressed in some affirmative way, and cannot be inferred from its mere failure or omission to authorize its own corporations to acquire the property or transact the business in question. In *Cowell* v. *Springs Co., 100 U. S. 55 (1879)*, lands in Colorado territory were conveyed by a patentee to a corporation created under the laws of Pennsylvania, with power to receive, hold and grant real and personal property; explore, locate and improve lands; transport emigrants and merchandise; construct houses and buildings; manufacture, trade and traffic; colonize, organize and form settlements, &c. By the laws of congress in force in the then territory of Colorado the legislature of the territory was prohibited from granting private charters and was authorized to create, by general law, corporations only for mining, manufacturing and other industrial pursuits. It was contended that the limitations of the purposes of corporations by the act of congress were fixed for reasons of public policy, and that the act should be considered as a declaration of public policy, under which powers denied to domestic corporations should not be extended to foreign corporations acting within the territory. Mr. Justice Field, upon this point says (at *p. 59*) : "The answer to this position is found in the general comity which, *in the absence of positive direction to the contrary,* obtains through the states and territories of the United States, by which corporations created in one state or territory are permitted to carry on any lawful business in another state or territory, and to acquire, hold and transfer property there *equally as individuals.* If the policy of the state or territory does not permit the business of the foreign corporation in its limits or allow the corporation to acquire or hold real property it must be expressed in some affirmative way; it cannot be inferred from the fact that its legislature has made no provision for the formation of similar corporations, or allows corporations to be formed only by general law. Telegraph companies did business in several states before their legislature had created or authorized the creation

of similar corporations; and numerous corporations existing by special charter in one state are now engaged, without question, in business in states where the creation of corporations by special enactment is forbidden." This is the leading case and authority upon the point that the public policy of a state, in reference to the exercise of powers by a foreign corporation within its limits, must appear from express affirmative legislation or decisions, and that the mere failure or omission to confer the powers in question upon its own corporations is not sufficient, and it has been followed without question. In *Christian Union* v. *Yount, 101 U. S. 352 (1879)*, the language of Mr. Justice Field is approved and it is further said by Mr. Justice Harlan (at *p. 356*) : "In harmony with the general law of comity obtaining among the states composing the Union, the presumption should be indulged that a corporation of one state, not forbidden by the law of its being, may exercise within any other state the general powers conferred by its own charter, unless it is prohibited from so doing either in the direct enactments of the latter state or by its public policy to be deduced from the general course of legislation or from the settled adjudication." In cases involving questions of this interstate character, the opinions of the highest federal court have been treated as of controlling weight, and the rules declared in these two leading cases appear to have been followed in the courts of all the states. The only conflict, or apparent conflict, between the decisions of the courts of different states seems to be in the application of the rules, and on the question as to the character of the constitutional or legislative provisions which are to be construed as affirmative prohibitions against the acts or transactions of foreign corporations.

Neither in the constitution, statutes or judicial decisions of Washington are there any express declarations prohibiting a foreign corporation from owning stocks of a Washington corporation. These stocks are by its statutes personal property, which therefore are transferable in other states to the same extent as other personal property, or to the extent allowed by the laws of foreign states, and if their acquisition by persons and corporations of other states is against the public policy of the State of Washington, such declaration of its public policy, restricting the

general rules of comity, as to the ownership of personal property, should appear by some authoritative declaration. The decision in the *Parsons Case* cannot be considered as having this effect. The case on this point was decided solely on the question of the construction of the statute of Washington as giving or not giving to a domestic corporation exercising its powers within the state the power to purchase stock of another domestic corporation, and upon this question of power it was held that inasmuch as the power was not expressly given by the statute, the statute must be construed as not giving the power to hold stock, or the power to vote on it if held. It would be giving the decision altogether too broad a scope to consider it as an adjudication by the highest courts of Washington upon the question of the public policy of that state as to the rights of a foreign corporation to own stock, and to consider it as deciding that the general rule of comity that corporations, as well as individuals of other states, may own stocks of their corporations has been held by the courts of Washington to contravene the public policy of the state. That question of public policy and the application of the rules of national and state comity was not involved in the case and was not considered. It is claimed that the logical result of the decision in the *Parsons Case* is to decide this question of public policy adversely to the defendant, but whether it has such result is a question for the decision of the Washington courts alone, and in the absence of any express affirmative declaration either by the constitution, statutes or courts of Washington settling its public policy, in reference to a transaction of the present character, adversely to the defendant, this court should not assume to declare or ascertain its public policy. This policy is something which the State of Washington has the sole right to determine itself. *Bank of Augusta* v. *Earle, supra* (at *p. 594*). Counsel have cited cases and authorities as holding or declaring that the rule of comity does not extend so far as to permit foreign corporations to exercise within the state powers which a domestic corporation of the same kind is not permitted to exercise under its constitution and policy. These are cases in which the courts of the state (not the state of the foreign corporation) are expressly and directly deciding the question of their own public

Coler v. Tacoma Railway and Power Co.

policy, in reference to the act which is challenged in their juris-diction, and the proceeding upon that direct adjudication. They are therefore, so far as they decide the question of public policy, affirmative declarations which the courts of other jurisdictions must accept as settling what the public policy of the particular state is when that question is involved. They do not support the complainant's claim in this case, which is that this court (a court of foreign jurisdiction), in advance of any adjudication of the Washington courts, should decide what is the public policy of Washington, in reference to the matter now in question. And in reference to the decisions in these cases, it should also be added that in determining the question of public policy of their respective states the cases generally rest upon the express provisions of their respective constitutions and statutes prohibiting the acts in question to domestic corporations, and not upon the mere omission or failure to give them the power to do or perform the acts. In *Clarke* v. *Central Railroad Co., 50 Fed. Rep. 338,* there was a constitutional prohibition of purchases to defeat competition or encourage monopoly. See *pp. 339, 344.* In *Empire Mills* v. *Allston Grocery Co., 4 Tex. App. Civ. Cas. 346,* it was held that the repeal of an act authorizing the formation of mercantile companies in the state superseded the rule of comity as to foreign corporations. The cases cited in *2 Morawetz Corp. 965, note 4,* are, with one exception, all cases where the courts of the state (or of the United States within the state) pass directly and authoritatively upon the question of their own public policy. The exception is the leading case of *Bank of Augusta* v. *Earle, supra* (at *p. 592*), where, on a writ of error from the supreme court of the United States to the United States circuit court for Alabama, one of the questions involved was whether the purchase of certain bills of exchange by a foreign corporation in the State of Alabama was contrary to the policy of the constitution and laws of the State of Alabama. The supreme court held (at *p. 594*) that the state had not, by its constitution and laws or judicial decisions, made known its policy upon the point in question, and declined to decide the questions of public policy raised, holding that this was a matter to be determined by the state itself. And following the same principle, the court also held

(at *p. 596*) that the decisions of the courts of the two other states—New York and Virginia—upon like questions of the public policy of their respective states, were not to be considered as justifying the inference that the State of Alabama would adopt the same rule of public policy.

I conclude, therefore, that as the case now stands, the New Jersey company would, under the rules of comity, be allowed to hold the stock of the Washington company, and having the right to hold, it follows, necessarily, in my judgment, that it would have the right to vote on the stock, in the absence of any declaration in the constitution, statutes or judicial decisions of the State of Washington that it could not vote on stock it was entitled to hold. I cannot give my assent, however, to the contention of defendants' counsel that the sale should not be enjoined, even if the power to vote on the stock was denied. This would allow a transfer of the entire property of the corporation to another corporation with no voice in its management or control of the latter, although its holdings of stock constitute one-half of the entire stock of the corporation. A transfer of the property, as well as of the rightful share in its control, would, in my judgment, amount to an abandonment of the duties of the directors and a surrender of the stockholders' rights to a voice in the control of their property. *Prima facie,* at least, a transfer which would have this result would seem to be fraudulent, and should not be allowed without further inquiry. As the company will have, in my opinion, the right to vote on the stock, I will, for this and the other reasons above stated, advise a decree denying the application for preliminary injunction.